## SCHWEINHAUT v. FLAHERTY.

### No. 5073.

Court of Appeals of District of Columbia.
Argued March 11, 1931.
Decided April 6, 1931.

C. H. Merillat, of Washington, D. C., for appellant.

Harry T. Whelan and William B. O'Connell, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and GRONER, Associate Justices.

GRONER, Associate Justice.

This action was originally brought in the Supreme Court of the District of Columbia by Delia Flaherty, appellee, whom we shall hereafter call plaintiff, against Wardman Park Taxicab Company, Inc., appellant, whom we shall hereafter call defendant, and was to recover from the defendant damages for personal injuries done to the plaintiff by carelessly and negligently driving a taxicab against her when crossing a street in the city of Washington.

The declaration alleges that the driver of the taxicab was the defendant's servant, and

engaged in its business. Defendant moved for a directed verdict on two grounds: First, that the evidence showed that the taxicab was not engaged at the time of the accident on business of the company, but in the personal affairs of the driver in transporting to her home a woman who was not a pay passenger; and, second, that the evidence showed that the accident was due to plaintiff's contributory negligence.

Defendant was the operator of taxicabs in the city of Washington, and had two exclusive concessions or stands, one located at Wardman Park Hotel and the other at Chastleton Apartment Hotel. Its drivers were instructed that, when three of its cabs drew up to the Chastleton stand, the cab at the head of the line should pull off and proceed to the other stand. When a cab was dismissed by a passenger, its duty was to report to the Wardman Park stand for directions, and, while in transit from one point to another, the driver was at liberty and expected to take on a passenger if hailed for that purpose. When not carrying passengers, the driver was expected to be on one or the other stand. There was no regular place fixed for the drivers to get their meals during working hours, but they were warned to use as little mileage as possible for that purpose, and not to go out of their way to eat.

On the evening in question, the driver of the taxicab involved had taken a passenger from the Chastleton Hotel to the Wyoming Apartments, and had then gone back to the Chastleton again. About 9 o'clock, while he was in line at the Chastleton, two other taxis of the defendant came up, and this required him to move. The driver, who had invited a female friend to meet him at the Chastleton that evening, and who had done so, thereupon invited her to get into the cab and go with him while he had his supper, and promised then to drive her home. He paid the company nothing for her transportation. The accident occurred after he had gotten his supper and was driving his woman companion to her home, which was several blocks out of his regular course.

■■ The first question for determination is whether the action of the driver of the taxicab in departing from his line of duty in his employer's business exempted the employer from liability for his negligence. There is, of course, no controversy here as to the rule that the master is liable for the negligence of the servant while the latter is acting in the master's business and within the scope of the employment, and equally is it admittedly true that such liability exists even in those cases in which the servant's negligent act is contrary to the master's instructions. In the latter case—where the servant is disobeying the master's orders and as a result injures a stranger—the question ordinarily is whether the servant was at the time acting within the course of his employment, that is to say, whether at the time of the injury the relation of master and servant obtained. Many cases may be cited to the effect that the servant's disregard of the master's orders, even though the disregard be impelled by some purpose personal to the servant, does not change the ordinary rule, or, in the event of injury to a third person as a result thereof, exempt the master from liability. Quinn v. Power, 87 N. Y. 535, 41 Am. Rep. 392; Kneff v. Sanford, 63 Wash. 503, 115 P. 1040. On the other hand, it is undoubtedly true that it has been frequently held in many of the state courts that, since the liability of the master in such circumstances grows out of the maxim qui facit per alium facit per se, the master is not liable if the tortious act of the servant occurs during a severance of the relationship, notwithstanding he may then be using his master's property.

This rule, as applied to cases of the wrongful use by the servant of his master's automobile, is well expressed in 2 R. C. L. page 1198, as follows: "The owner of an automobile is not liable to one who is injured by the negligence of his chauffeur while operating the machine without his knowledge or permission and for a purpose other than that for which he was employed, as where the driver is on an errand personal to himself, or is making a detour for his own purpose." Following this rule, it has been held that, where the servant steps outside of his employment to do an act for himself not connected with his master's business, no liability attaches. Tyler v. Stephan's Adm'x, 163 Ky. 773, 174 S. W. 790. And so here we are asked to hold in effect that defendant cannot be held liable because the driver of his cab was at the time of the injury to plaintiff using the same in violation of the master's rule, and this too, notwithstanding it is not contested he was then in the master's employ and rightfully in possession of the cab. This we think is not and, should not be the law. We cannot shut our eyes to the fact that an automobile, in the crowded conditions of street traffic as it exists today in large cities, is, as was declared by Mr. Justice Sutherland in the recent case of District of Columbia v. Colts, 282 U. S. 63, 51 S. Ct.

52, 53, 75 L. Ed. ——, decided Nov. 24, 1930, "potentially, a dangerous instrumentality," nor to the further fact, of universal knowledge, that the fatalities due to its use, as shown in the published statements of state bureaus and insurance companies, approach those of modern warfare. Nor likewise are we unmindful of the fact that conditions in this respect are growing worse rather than better.

In these circumstances, it seems to us the duty of the courts to indulge no subtle reasoning in extending the doctrine of nonliability to the owner of such an instrumentality who, in his search of gain and profit, places one of these in irresponsible hands, but rather to require of him such supervision of his servant as will avoid disobedience to and disregard of his rules, or, failing so to do, when injury occurs to a stranger, to shoulder the responsibility. Hence we are of opinion that whatever may be the rule in the case of a private chauffeur who, in violation of his master's orders, takes his private automobile and uses it without the master's knowledge and for the servant's purposes alone, or, in the case of one intrusted for the moment by its owner with an automobile for a specific purpose who, in disregard of that purpose, uses it for another, the rule in the case of one who, as a carrier of passengers for hire, places an automobile in the hands of a servant for the purpose of soliciting and obtaining fares and transporting them from one part of the city to another, and who, in such circumstances, admittedly would be liable to a pedestrian negligently injured by the servant, should reasonably be held to include liability for an injury inflicted by the negligence of the servant where that servant, in violation of the master's rules, is, as was here the case, transporting free a friend to her home near by. There is, we think, nothing novel in such a rule. Precisely the same proposition was many years ago announced by the Supreme Court in an action against a railroad company in a case in which an injury was caused through the negligence of an employee in disregard of the general orders or special command of the employer. Philadelphia & Reading R. Co. v. Derby, 14 How. 468, 487, 14 L. Ed. 502. In that case, Mr. Justice Grier, speaking for the court, used this striking language: "Nothing but the most stringent enforcement of discipline, and the most exact and perfect obedience to every rule and order emanating from a superior, can insure safety to life and property. The intrusting such a powerful and dangerous engine as a locomotive, to one who will not submit to control, and render implicit obedience to orders, is itself an act of negligence, the 'causa causans' of the mischief; while the proximate cause, or the ipsa negligentia which produces it, may truly be said, in most cases, to be the disobedience of orders by the servant so intrusted. If such disobedience could be set up by a railroad company as a defence, when charged with negligence, the remedy of the injured party would in most cases be illusive, discipline would be relaxed, and the danger to the life and limb of the traveler greatly enhanced. Any relaxation of the stringent policy and principles of the law affecting such cases, would be highly detrimental to public safety."

In the case under consideration, defendant placed its taxicab in the hands and under the control of its driver. It instructed him as to his duties, and these instructions included a prohibition of his use of the cab except in transporting passengers for pay in accordance with its established tariff. The injury here complained of occurred because the driver, in disobedience of defendant's rules, was transporting a passenger—a friend—free of charge, and doubtless, except for this disobedience, the injury would not have happened. But, as we think, having intrusted the cab to the driver, it is not enough that the servant disobeyed the master's instructions, nor do we think such disobedience—not amounting to an obvious or complete abandonment of the service (Kruse v. White Bros., 81 Cal. App. 86, 253 P. 178)—ipso facto destroys the relationship of master and servant, or makes inapplicable the rule of respondeat superior, but that for injury thus sustained the master should respond, and on the ground that the master's act in putting it in the servant's power, through the use of the car, to do the damage, creates the liability, notwithstanding it would not have occurred except for the servant's disobedience of the rule. Phila. & R. R. Co. v. Derby, 14 How. 468, 14 L. Ed. 502; Sleath v. Wilson, 9 Car. & P. 607.

To the extent that what is said above may be in conflict with Lucas v. Friedman, 58 App. D. C. 5, 24 F.(2d) 271, the latter case may be considered as overruled.

It is next insisted that binding instructions should also have been given because plaintiff's own evidence establishes that she was negligent in failing to look as she crossed the street and in failing to use due care for her own safety. The evidence shows that she left her brother's house on Twentieth street to go home, proceeding south on the

east side of Twentieth street toward M street; that, when she reached the north curb of M street, she looked to the right and left to see if there were any cars approaching in either direction. She observed nothing to hinder her safe passage, and walked rapidly in a straight line across the street, and just as she reached the curb on the south side she was struck by the cab. It is admitted that, under the District traffic regulations then in effect, plaintiff had the right of way, but it is urged by defendant's counsel that, notwithstanding this, it was plaintiff's duty to keep a constant lookout as she crossed the street, and that, because of her failure in this respect, she was guilty of contributory negligence barring her recovery. Faucett v. Bergmann, 57 App. D. C. 290, 22 F.(2d) 718. We have examined the evidence carefully, and have reached the conclusion that the question in this respect was properly submitted to the jury. Plaintiff on her cross-examination was asked by counsel for defendant if she had looked in either direction while she was crossing the street, and replied, "I look every time I cross the street, and I am sure I looked then." Later, in answer to the same question, she stated she had looked in both directions as she left the curb, but that while on the concrete she "had no time," and on still another occasion, "I could not look; I had no time; when this fellow came to the curb-stone and hit me, I was knocked out." Plaintiff was sixty-five years old at the time of the accident, and many of her answers to questions both of her own counsel and defendant's show that her statement that "my head is not right since this happened to me" was not a pose, but very likely reflected her confusion in remembering events that had occurred more than two years before. In one of her answers, as we have shown, she distinctly said she looked up and down after leaving the curb; in another the meaning is confused, and we are not prepared to say whether she meant that she had not looked at all "while on the concrete," or whether she meant she had not looked at the moment of the impact. In these circumstances, the court properly, we think, submitted the question to the jury with appropriate instructions, to which no exception was taken. To have directed a verdict on the ground that plaintiff's own evidence showed her guilty of contributory negligence would, in the circumstances we have instanced, have been error, for, as we have said innumerable times, "it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." Washington Ry. & Electric Co. v. Buscher, 54 App. D. C. 353, 298. F. 675, 678.

Defendant's final ground of error, namely, that the court erred in permitting the witness Chichester to testify to the speed of the cab at the time of the injury, was not pressed in the argument, and we think properly so, because the record shows that the objection to this evidence was sustained by the trial court, and no error in this respect could or should have been assigned.

Affirmed.