SIMON v. CITY CAB CO., Inc.

No. 6265.

United States Court of Appeals for the District of Columbia.

Argued Jan. 8, 1935.

Decided May 13, 1935.

Rehearing Denied June 11, 1935.

HITZ, J., dissenting.

———◆———

Louis Ottenberg, George D. Horning, Jr., and H. M. Ammerman, all of Washington, D. C., for appellant.

Alwin L. Newmyer and David G. Bress, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

This action was brought in the Supreme Court of the District of Columbia by appellant, plaintiff below, against defendant, City Cab Company, for damages sustained by the plaintiff through the alleged negligence of the driver of one of the defendant's cabs. At the conclusion of all the evidence the court, on motion of defendant, directed the jury to return a verdict in its favor. From the judgment, this appeal was taken.

It appears that one James Hall Semmes, Sr., had been employed by the defendant company in June, 1932, to operate the taxicab in question. He paid defendant $3.25 daily, whether he did any business or not. He was entitled to retain all he earned above that amount. He was permitted to keep the cab at his place of residence in Tacoma Park, Md., but was required to report to defendant each day. When he returned home in the evening, it was his custom to leave the cab standing in the driveway beside his house, and to leave the keys in the switch of the car.

His son, James Hall Semmes, Jr., a licensed hacker, occasionally drove the cab at night, sometimes with and sometimes without his father's permission. The son was driving the car on the night of the accident, having taken it without his father's permission, and, after discharging a passenger, was returning home about half past two on the morning of October 4, 1932, when the accident occurred.

Plaintiff belonged to one of the fire companies, and was in attendance at a fire on Tenth street in this city. He was engaged in replacing the hose in a fire truck when Semmes, Jr., driving the taxicab, ran into him, crushing his leg between the taxicab and the hose wagon, so severely injuring his leg as to require its amputation.

On the issue of negligence, there is ample evidence to take the case to the jury, but the court directed a verdict on the ground that Semmes, Jr., was not the agent of the defendant for the operation of the taxicab, and that the company was therefore not liable. This raises the single question necessary for the determination of this case. The uncontradicted evidence discloses that Semmes, Sr., under his contract with the defendant to

operate the taxicab, was without authority to permit any one else to use or operate the cab for any purpose whatever. We think, therefore, that whether or not he permitted his son to drive the cab on the night of the accident is immaterial. In neither event could Semmes, Sr., to this extent extend the scope of his agency without the consent of his principal. This elementary rule of agency we think is decisive of this case. It was not within the power of Semmes, Sr., to permit any one else to use the cab, either in the course of the company's business or otherwise, without the consent of the company; and if Semmes, Jr., on the night in question was using the cab without the permission of his father, the situation is not different from a case where a car has been stolen and an accident occurs when it is operated by the thief. Under no circumstances in such a case could the owner of the car be held liable.

Counsel for plaintiff invoke the rule of law that where the plaintiff is injured by a taxicab bearing the name of the owner, the presumption arises that the vehicle is in the custody and on the business of the defendant, and that the driver is its agent and acting within the scope of his employment. This presumption, if standing alone, is sufficient to establish a prima facie case, and if uncontradicted, to carry the case to the jury. In Callas v. Independent Taxi Owners' Association, 62 App. D. C. 212, 66 F.(2d) 192, 194, the taxicab bore the peculiar colors and trade-name of the defendant company, and it was held that this was sufficient to raise the presumption that it was "in the custody and on the business of the person whose name it bore." The president of the company testified that it did not own a cab and intimated that it was not in the cab business, and there was no evidence to show that the operator of the cab was or was not a member, servant, or agent of the company. It was there held that these facts were not sufficient to overcome the presumption to the extent of authorizing the court to take the case from the jury. On this point the court said: "Whether the effect of this presumption was overcome by the testimony of the president of the company that it did not own a cab, and his intimations that it was not in the cab business was a question of fact for the jury, and consequently its decision as a question of law by the court was error." The court, in support of this holding, quoted with approval from Holzheimer et ux. v. Lit Brothers, 262 Pa. 150, 152, 105 A. 73, as follows: "So far as the liability of the defendant was concerned, the plaintiffs' case rested wholly upon a presumption. There was no direct evidence as to who was the owner of the truck that inflicted the injury, nor as to who was in charge of it when the collision occurred. There was evidence, however, that the truck bore the name of the defendant company. This was sufficient to establish, not only a prima facies that the defendants were the owners of the truck, but also that it was then in charge of their servant or employee. This was presumptive evidence, and, as has frequently been ruled, was quite sufficient to carry the case to the jury."

The instant case, however, can be clearly differentiated from the Callas Case. The facts in the present case are all disclosed, leaving no room for reliance upon a presumption. Whatever presumption arose was overcome by uncontradicted proof. Where that situation clearly arises, a motion for a directed verdict should be granted. If, however, the evidence is contradictory, or reasonably subject to contradictory interpretations, as was held in the Callas Case, the question of liability then is one for the jury.

In the instant case, defendant admits the ownership of the taxicab, admits the employment and agency of Semmes, Sr., and proved conclusively, at the time of the accident, the car was in the possession of Semmes, Jr., a total stranger to defendant, who possessed no authority, express or implied, to operate the car for the defendant or to use it in carrying on its business; and whose prior and instant use of the cab was without its knowledge or consent. Indeed, these facts stand uncontradicted, and to submit the issue to the jury of whether or not they are sufficient to overcome the presumption establishing a prima facie case, would be to submit the rights of the defendant to the speculation and sympathy of the jury.

It is difficult to conceive of a case where the owner of an automobile, used privately, for business purposes, or publicly as a taxicab, could be held liable for an accident caused by the car while operated by a person unknown to the own-

er and without his express or implied permission. Clear it is, that the agent of the owner, in whatever capacity he is charged with the use or operation of the car, cannot without the knowledge or consent of the owner transmit his agency to a person unknown to the owner, and thereby impose liability on the owner for the reckless or negligent operation of the car.

Nor does it follow that the owner is always liable for an accident occurring through the negligent operation of his car by his servant, agent, or employee. In Peabody v. Marlboro Implement Company, 63 App. D. C. 288, 72 F.(2d) 81, 82 (certiorari denied by the Supreme Court, 293 U. S. 601, 55 S. Ct. 117, 118, 79 L. Ed. ——), defendant company admitted the ownership of the automobile but denied that the operator thereof, at the time of the accident, was operating it as the agent or employee of the defendant. The testimony disclosed that the driver of the car was in the general employ of defendant company, and was in custody and control of the car and permitted to use it in the business of the company, and when it was not in such use to keep it in his own garage.

The uncontradicted testimony showed that at the time of the accident the agent was using the car on a personal mission, not directly or indirectly connected with the company's business, or with its knowledge or consent. The court, speaking through Mr. Chief Justice Martin, distinguishing the Callas Case, and, holding that the verdict had been directed properly for the defendant, said: "It is true that in Callas v. Independent Taxi Owners' Association, 62 App. D. C. 212, 66 F.(2d) 192, we held that a car operated as a taxicab at the time of an accident, bearing the peculiar colors and trade name of the defendant company, was legally presumed to be in the custody and on the business of the company whose name it bore. But in Curry v. Stevenson, 58 App. D. C. 162, 26 F.(2d) 534, we held that where the prima facie inference of possession of the automobile at the time of the accident, arising from the fact of ownership, is overcome by uncontradicted proof that in fact the automobile was not in possession of the owner or his servant or agent, the question is one for the court, and not for the jury. We think that this rule is equally applicable where the issue relates to the liability of an owner for the alleged negligence of an agent in the operation of a car."

Special stress is placed by counsel for plaintiff on the case of Schweinhaut v. Flaherty, 60 App. D. C. 151, 49 F.(2d) 533, 535. In that case the agent of the taxicab company in whose hands the taxicab had been placed for the purpose of soliciting and obtaining fares and transporting passengers departed from the purpose for which he was employed to take a woman friend to her place of residence free of charge. While thus engaged, he collided with a pedestrian, and the injury complained of was sustained. It was therefore contended that the company was not responsible for the reason that its servant or agent was not engaged in the regular course of the company's business at the time the accident occurred. We held the company liable, but in so doing we approached so close to the line that the rule of liability announced in this case will admit of little if any extension.

In that case the court, speaking through Mr. Justice Groner, clearly stated the rule of liability in taxicab cases, as follows: "In these circumstances, it seems to us the duty of the courts to indulge no subtle reasoning in extending the doctrine of nonliability to the owner of such an instrumentality who, in his search of gain and profit, places one of these in irresponsible hands, but rather to require of him such supervision of his servant as will avoid disobedience to and disregard of his rules, or, failing so to do, when injury occurs to a stranger, to shoulder the responsibility. Hence we are of opinion that whatever may be the rule in the case of a private chauffeur who, in violation of his master's orders, takes his private automobile and uses it without the master's knowledge and for the servant's purposes alone, or, in the case of one intrusted for the moment by its owner with an automobile for a specific purpose who, in disregard of that purpose, uses it for another, the rule in the case of one who, as a carrier of passengers for hire, places an automobile in the hands of a servant for the purpose of soliciting and obtaining fares and transporting them from one part of the city to another, and who, in such circumstances, admittedly would be liable to a pedestrian negligently injured by the servant, should reasonably

be held to include liability for an injury inflicted by the negligence of the servant where that servant, in violation of the master's rules, is, as was here the case, transporting free a friend to her home nearby. There is, we think, nothing novel in such a rule."

That case, however, is easily distinguished from the one at bar for the reason that the agent of the company was in charge of the cab and driving it at the time the accident occurred. Here, when the accident occurred, the cab was being driven by a total stranger—one with whom the company had no express or implied contractual relation. His possession of the automobile was not such as in any manner to attach liability to defendant.

The judgment is affirmed, with costs.

HITZ, Associate Justice (dissenting).

I am unable to agree with the judgment and opinion of the court in this case.

The plaintiff below was a member of the fire department of the District of Columbia, injured while at duty on a Washington street by a cab of the defendant company, the driver of which admitted that he was looking in another direction at the time of the collision and did not see the plaintiff or his hose reel until after he had struck him.

The ownership of the cab by the defendant company, the grievous injury to the plaintiff, and the negligence of the driver are admitted, but his agency is denied.

The father of the driver was employed to drive this cab by an oral agreement between the company and the father, who was said to have been instructed to permit no one else to drive it.

This agreement required the father to pay the company $3.25 per day, and to exhibit the car as a going concern at the company's garage once every 24 hours, between 7 a. m. and 7 p. m. All earnings above that sum were retained by the father. No accounting was required; no mileage kept; no uniform worn; no identification card furnished; no fixed stations required; but the drivers might cruise at will; and were permitted to keep the cars in their own way at home or elsewhere, although the company's garage was ample to accommodate all its cars. Each driver furnished his own hacker's license, but the company neither kept a record thereof, nor checked its expiration.

The defendant company participated in a clearinghouse arrangement with other such companies to check upon drivers, and kept two cruising inspectors on the streets at all times.

This arrangement not only authorized, but induced, continuous operation of the cab by a method of speculative compensation for the joint benefit of owner and driver, which inevitably led the driver to work too rapidly and too long. Both father and son were licensed hackers; both lived in the same house; and the evidence indicates that, by arrangement between them, the father drove by day and the son by night.

On the evening of this accident the father reached home at 7 o'clock; left the cab in his open driveway, with the key in the switch; whence the son took it at 7:30, started on a hacking cruise; discharged his last passenger at 2 o'clock in the morning; and struck the plaintiff shortly thereafter on his way to his home in Maryland, where the cab was kept.

The son testified that he had frequently used the cab in this way with his father's permission, but did not ask it on this occasion; the father testified that he had frequently permitted the son to use the cab, but not specifically on this night; while both testified that they knew of no authority from the company for the son's use of the cab at any time, or that the company was aware of his using it.

The trial court directed a verdict for the defendant upon which judgment was entered, and now this court affirms that action on what it calls "the elementary rules of agency," which, as I think, entirely miss the mark.

For, in my view, the precise arrangement between the father and son is immaterial to the issue, and the defendant company is liable under other principles than the elementary rules of agency controlling the peaceful transactions of ordinary business between man and man.

In the turntable cases the Supreme Court long ago established the doctrine that the owner of a dangerous but attractive instrumentality, which is left accessible to the public, is bound to anticipate its probable use or invasion by un-

authorized and unqualified persons, to the injury of themselves or others; and even where the evidence is weak, and the negligence is slight, and the victim is a trespasser, yet the owner is liable if he omitted reasonable precautions to guard against such use and injury. Sioux City & P. R. R. Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745; Union P. Ry. Co. v. McDonald, 152 U. S. 262, 14 S. Ct. 619, 38 L. Ed. 434; Best v. D. C., 291 U. S. 411, 54 S. Ct. 487, 78 L. Ed. 882.

And Lord Ellenborough extended this protection even to trespassing dogs coming accidentally within the sphere of an attraction alluring to their instincts, though the Attorney General of England argued without avail that an Englishman could lawfully bait his own traps on his ground for his own vermin, without being answerable to his neighbor whose dogs might get caught therein while trespassing on his land.

Yet Lord Ellenborough held otherwise, and asked, "What difference is there in reason between drawing a dog into a trap by means of his instinct which he cannot resist, and putting him there by manual force? If a man knowingly keep a dog accustomed to bite, and any person coming in his way be bitten, an action lies against the owner, though he had no malice against the individual." Townsend v. Mathew, 9 East. 277.

And in a case where a gun, erroneously thought by the owner to be unloaded, was left in a place accessible to children, and discharged by one to the injury of another, the same great judge held the owner liable, "as by this want of care, that is by leaving the gun without drawing the charge, the instrument was left in a state capable of doing mischief, the law will hold the defendant responsible. It is a hard case undoubtedly; but I think the action is maintainable." Dixon v. Bell, 5 M. & S. 198.

So, where a man left his horse and cart standing on the street without attendance, and another man whipped the horse, resulting in injury to a third, the owner was held liable by Chief Justice Tindal, although it was contended that the man who whipped the horse, and not the man who owned him, was responsible, but the court said, "If a man chooses to leave a cart standing on the street, he must take the risk of any mischief that may be done." Ilidge v. Goodwin, 5 C. & P. 192.

In the leading case of Lynch v. Nurdin (1 Q. B. D. 29) Lord Denman said that "if I am guilty of negligence in leaving anything dangerous where I know it to be extremely probable that some other person will unjustifiably set it in motion to the injury of a third, and if that injury should be so brought about, I presume the sufferer may have redress by action against both or either of the two, but unquestionably against the first."

And 57 years ago today Lord Chief Justice Cockburn, in language strikingly applicable to present conditions, said that "It appears to us that a man who leaves in a public place, along which persons, and amongst them children, have to pass, a dangerous machine which may be fatal to anyone who touches it, without any precaution against mischief, is not only guilty of negligence, but of negligence of a very reprehensible character, and not the less so because the imprudent and unauthorized act of another may be necessary to realize the mischief to which the negligent act of the defendant has given occasion." Clark v. Chambers, 3 Q. B. D. 339, April 15, 1878.

These well-considered English cases, and others like them, have been repeatedly approved by the Supreme Court of the United States, as in 152 U. S. 262, at pages 278–280, 14 S. Ct. 619, 38 L. Ed. 434. And it is matter of common knowledge that modern automobiles are more dangerous than horses on English roads fifty years ago, or than turntables ever were at any time, or sporting guns, or baited traps. Yet pedestrians in Washington, and her firemen at their hazardous duties on her streets, receive less protection under her law today than was given to trespassing dogs in England by the English law a century ago, as against a dangerous instrumentality more deadly than anything in use outside of actual warfare, which is permitted to ply the public streets in a public calling for a private gain, under the gracious protection of the "elementary rules of agency."

Two recent cases in this court were based upon principles which I think controlling here, in the first of which we held that a cab driver deviating from his course to take home his girl, and thereby killing a pedestrian, was still in the employ of his employer, who remained

liable for his act; while in the second we held that the question of the driver's agency was matter of fact for the jury and not matter of law for the judge.

In each of these cases a cab company attempted to escape liability under the "elementary rules of agency," but the court then found itself unable to allow a defense which it welcomes now. Schweinhaut v. Flaherty, 60 App. D. C. 151, 49 F.(2d) 533; Callas v. Diamond Cab Co., 62 App. D. C. 212, 66 F.(2d) 192.

The New York Court of Appeals, in extending the principle of Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455, beyond poisons and explosives, to automobiles, in a case where a purchaser who had no contractual relation with the manufacturer of his car was injured by the collapse of a wheel which the manufacturer bought but did not make, held that the duty of care goes beyond things which in normal operation are implements of destruction, to things which are reasonably certain to endanger life and limb if negligently made.

Here Judge Cardozo said: "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law." McPherson v. Buick Motor Co., 217 N. Y. 390, 111 N. E. 1050, 1053, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440.

And the Supreme Court, in affirming this court in a case where a man was charged with fast and reckless driving "so as to endanger property and individuals," very recently said, "The offense here charged is not merely malum prohibitum, but in its very nature is malum in se. It was an indictable offense at common law, * * * when horses, instead of gasoline, constituted the motive power. * * *

"An automobile is, potentially, a dangerous instrumentality, as the appalling number of fatalities brought about every day by its operation bear distressing witness. To drive such an instrumentality through the public streets of a city so recklessly 'as to endanger property and individuals' is an act of such obvious depravity that to characterize it as a petty offense would be to shock the general moral sense." District of Columbia v. Colts, 282 U. S. 63, at page 73, 51 S. Ct. 52, 53, 75 L. Ed. 177; Hess v. Pawloski, 274 U. S. 352, at page 356, 47 S. Ct. 632, 71 L. Ed. 1091.

Manslaughter by automobile goes flagrantly unwhipt of justice, because twelve drivers sit on every jury.

And if judges continue to apply to this Juggernaut the elementary rules of agency and employment, which serve well enough among brokers and bookkeepers, but have no potency against the automobile, the wide trail of death and destruction will grow wider.

The motorcab is a demonstrated danger. But its deadly course can be legally controlled to an important extent by two measures, both of which are now sadly lacking in the District of Columbia.

First, by the courts, through holding the owner of a public automobile liable for any damage done thereby in any hands except those of a thief who has stolen it despite reasonable precaution by the owner to keep it safe, through lock and key or otherwise.

And this can be lawfully accomplished by application of principles long ago established to guard not only persons, but animals, against social dangers far less potential and all-pervading than the automobile is today.

Secondly, by a system of compulsory insurance preliminary to license of either cab or driver, such as prevails in some of our states, but which can be created here only by Act of Congress.

Between January 1st and this 15th day of April, 1935, 32 persons have been killed by automobiles on the public ways of the District of Columbia, and not through any catastrophe involving many persons, but by the daily crop of casualties flowing from the daily course of traffic.

The futile attempt to control this slaughter by "the fundamental rules of agency" should give way to rules equally fundamental and well established, but more stringent. The principles of the common law, by their inherent vitality and continuing growth, are competent to cope with many of the new facts and difficulties of life that develop from year to year and from generation to generation as the complexities of the world increase, but not if the courts decline to employ the old powers so ready to their hands.

Hundreds of these taxicabs, flying the false colors of an incorporated responsibility which they assume but do not possess, and which disappears at every attempt to enforce it, are daily dashing about our streets in the hands of youthful drivers, irresponsible, uninsured, and driving on speculation.

I think the obligation of ownership follows the cab, and is not dissolved when it finds its way into unauthorized hands through the negligence of the owner or his agent.

The ordinary rules of agency are inadequate to the situation, because the obligation of the owner is to answer not only for the agent, but also for the thing.

And his legal duty is to foresee that a thing so alluring, so capable of profit, so mobile, and so dangerous, as a motorcab, is likely to be used by unauthorized persons to the public injury if left in accessible places unguarded and unlocked. He is, therefore, bound to take reasonable precaution to prevent such use and such injury, which duty is not discharged by leaving his cab in an open space with the key in the switch.

I find nothing to indicate any recognition of responsibility to the public in the defendant's profit-sharing arrangement with irresponsible drivers, who are permitted to keep its cabs outside of its ample garage, outside of its opportunities for supervision, and beyond the jurisdiction, for months at a time, so long as they pay their daily portion, and make daily profert of the cab.

And after this collision, which left the plaintiff crippled for life, and the defendant free from responsibility, the company continued the same arrangement with the same driver on the same loose terms, repairing his damaged cab, and rewarding him with another.

The foregoing cases are not cited as being precisely in point, but because they illustrate a line of judicial thought, of long standing and high authority, capable of contributing much to the mitigation of a great and growing evil, if duly followed and developed.

For while these cases differ as much in their facts and circumstances as in their time, underlying them all goes the doctrine that ownership or control of property of certain sorts involves an obligation to recognize the potential danger inherent in its nature.

Which raises an affirmative duty to foresee that such property is likely to be used or moved by unauthorized persons for unintended purposes; which in turn creates a public obligation to guard such property against such use or movement, lest injury come to the innocent.

There can be no more appropriate occasion to apply this doctrine than this case, where the owner is engaged in a public calling, performable only upon the public streets by a public license, and his car negligently maims a man doing a necessary public duty upon those streets.

As the Lord Chancellor of England recently said when asking the aid of Parliament for the English courts in dealing with their automobile problem, "the motor car has within it possibilities of greater evil and unhappiness for the human race than any invention that has ever been discovered." Buckmaster, Orator of Justice, 282 (Edited by James Johnston, 1932).

I think the judgment should be reversed, and the cause remanded for a new trial.

GRONER, Associate Justice.

I agree in principle in the views expressed in Judge HITZ'S dissent, but I feel that to apply them here would be to assume the power and functions of the Legislature. I therefore concur in the conclusion reached by the court.