Robert F. **WARREN** and Caroline S. **Warren**, Plaintiffs,

v.

The **UNITED STATES of America, National Park Service, Department of the Interior,** Defendants.

**Civ. A. No. 92–1830.**

United States District Court, District of Columbia.

Dec. 15, 1993.

---

Robert R. Michael, Shadoan and Michael, Rockville, MD, Louise Bouscaren McKnew, Bethesda, MD, for plaintiffs.

Richard N. Reback, Douglas A. Wickham, Asst. U.S. Attys., Washington, DC, for defendants.

## OPINION

JUNE L. GREEN, District Judge.

On June 24, 1989, plaintiff Robert Warren sustained a devastating injury to his cervical spine causing quadraparesis.[1] Mr. Warren brought this action under the Federal Tort Claims Act ("FTCA") against the National Park Service ("NPS") alleging that his injury was caused as a result of falling from a set of stairs, negligently maintained by NPS, located by a creek or stream in the Battery Kemble Park section of Rock Creek Park. Mr. Warren's wife, Mrs. Caroline Warren, asserted a claim for loss of consortium. The government defended the action, in part, presenting evidence that plaintiff did not fall from the stairs, but fell while attempting to cross the creek by traversing a fallen tree, situated about ten feet from the stairs, that formed a natural bridge over the creek.

The case was tried before the Court on July 23 through August 5, 1993. After considering all the testimony, exhibits and arguments presented, the Court concludes that the government is not liable in this case because the plaintiff has failed to carry the burden of proving the factual predicate to his claim; that is, that his injury resulted from falling off of the stairs.

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Findings Of Fact

At the time of the accident, Mr. Warren was 60 years old. He was physically fit, jogging an average of three times a week as well as regularly engaging in sports activities such as soccer and tennis. On Saturday, June 24, 1989 Mr. Warren awoke, ate breakfast alone and set about working on a home project of cleaning out and rearranging the garage storage room of his house.

Mr. Warren completed the project in the late afternoon and, having no tennis or soccer game that day, decided to go jogging. He drove to 49th Street in Northwest District of Columbia and parked at one of the entrances to Battery Kemble Park near a dam. He entered the park, crossing over the small concrete dam and jogged along a trail to MacArthur Boulevard. From there he jogged to a point near the intersection of Foxhall Road and Nebraska Avenue where he doubled back along the trail toward the location of his car on 49th Street. In order to get from the trail back to 49th Street it was necessary to cross a creek. Mr. Warren decided to cross the creek at point known as the Wesley Heights Trail connector, located south of where he had entered the park.

What Mr. Warren did at this point was the most important factual inquiry in the case; that is, whether he descended upon and then fell from the set of stairs constructed of railroad ties which was built into the embankment leading down to the creek, or, whether he attempted to cross the stream over a fallen tree which bridged the creek about ten feet from the location of the stairs.

The Court finds that Mr. Warren failed to establish by a preponderance of the evidence that he fell from the stairs. While it is undisputed that Mr. Warren was alone at the time of his accident and that no other persons witnessed the event, Mr. Warren was unable to recall at trial how the injury occurred and whether his accident was caused by the condition of the stairs.

Mr. Warren testified that he finished his running and started to take the trail leading over to 49th Street. See Trial Transcript (hereinafter "Tr."), July 27, 1993, Volume III, p. 22. He said he observed some steps that were "quite steep" leading down the embank-

---

1. The Court received expert medical testimony defining quadraparesis as a state of partial paralysis in the upper limbs and full paralysis in the lower limbs.

ment to the stream and that he "started down those." *Id.* at 22–23. The next thing he recalled was the feeling that he was lying on the ground unable to move his legs to get up. He said he was scared and that he was "conscious enough to realize that I had to get help and to call out and try to continue calling." *Id.*

Mr. Warren said he did not remember anything else about the injury. *Id.* He did not remember how many stairs he descended, the location on the stairs from which he fell, or where he landed when he fell. *Id.* at 23, lines 4–13. Mr. Warren also testified that he did not remember speaking with any physicians while in the emergency room of the hospital after the accident. *Id.* at 24.

Plaintiffs introduced expert testimony that given the condition of the stairs, it was more likely than not that Mr. Warren fell off the step identified as step No. 5 on a diagram of the stairs received as Plaintiff's Exhibit 2. This testimony does not establish the cause of injury, however, absent a factual basis for concluding that Mr. Warren's accident occurred upon the stairs.

To that end, an expert witness, called by the Plaintiffs, offered the opinion that based upon the nature of the injury and the position in which Mr. Warren was found when he was rescued one can conclude that he fell from the stairs. The expert, Dr. Leon Kazarian, a biomechanical consultant, said that Mr. Warren's injury must have occurred from a forward fall, head-first, into a sandy area of the creek bed. *See* Tr., July 26, 1993, at 29. The Court was ultimately not persuaded by Dr. Kazarian's theory because it was internally inconsistent and grounded upon assumptions that were not borne out by the evidence later admitted at trial.

For example, while Dr. Kazarian theorized that the fall must have been a forward one, he did not explain how Mr. Warren ended up lying in an area to the left of the stairs, as opposed to the area in front of, or forward of the base of the stairs. He reasoned that Mr. Warren fell to the left side because the photographs demonstrated that the area to the left contained sand, whereas "if he went forward he would have impacted the steps—into rocks." *Id.* Dr. Kazarian also did not recon-

cile his theory of a forward fall with the fact, as conveyed by Captain Joseph Neville the rescue worker who first attended to Mr. Warren, that Mr. Warren was found lying on his back. *See* Tr., July 27, 1993, at 125.

Dr. Kazarian further based his opinion that Mr. Warren fell from the stairs on information about the position in which Mr. Warren was found. Dr. Kazarian assumed that Mr. Warren was found with his head toward the tree and his feet toward the stairs. Tr., July 26, 1993, at 42. He then stated that if the plaintiff had fallen from the log, he would have ended up in the opposite position. *Id.* The biomechanical consultant's assumption, however, was not supported by later testimony. Captain Neville's testimony established that Mr. Warren's head was situated approximately two or three feet from the fallen tree, but it did not illuminate any further the angle or position of Mr. Warren's body relative to the tree or the stairs. Tr., July 27, 1993, at 123–136. In fact, Captain Neville testified that during the rescue he did not see any stairs. *Id.*, at 127.

Finally, the biomechanical consultant's opinion that the injury was the result of a forward fall only, was contradicted in later expert testimony. The Court heard the expert testimony of a neurosurgeon that Mr. Warren's injury could have been the result of either a forward or a backward fall off of a height. Tr., August 2, 1993, at 96–98.

Thus, there is insufficient evidence to establish that Mr. Warren fell while descending the stairs.

Moreover, the physicians who treated Mr. Warren and spoke with him immediately after he was rescued and brought to Georgetown University Hospital testified that they learned from Mr. Warren that he had fallen while attempting to cross a stream by walking across a log.

For example, shortly after his arrival to the emergency room at Georgetown University Hospital, the plaintiff was independently examined by the neurosurgery resident, Dr. Christopher Duma. Dr. Duma testified that the plaintiff was alert and oriented fully at the time of the examination and able to communicate verbally with ease. *See* Govern-

ment Exhibit 59, Deposition transcript of Christopher M. Duma, M.D., July 19, 1993, (hereafter "Duma Dep."),[2] p. 8.[3] Dr. Duma also testified that although Mr. Warren had a reduced body temperature, this condition did not impair his ability to respond to questions or otherwise convey information. *Id.* at 29–30.

Mr. Warren told Dr. Duma that the injury occurred while Mr. Warren was jogging through Rock Creek Park. He said he was traversing a log which was stretched across or alongside a creek and slipped off from the log to the surface below which was a height of about four or five feet. *Id.*, at 19–20. Dr. Duma asked him whether he lost consciousness at the time of the accident and Mr. Warren said he did not. *Id.*, at 20–21. Dr. Duma's impression at the time, and one of the reasons why he remembered this patient, was that it was interesting to him that a 60 year old man had been jogging at night and that he was attempting kind of a "daring maneuver going across a log," which "may be something that a youth would do." *Id.*, at 19, 55.

Immediately after the examination, Dr. Duma recorded the information about the injury as well as the results of the physical and neurologic examination in a "progress note." Government Exhibit 31a, at pp. 1–2.[4] The note was approved and signed by Dr. Louis Rosa, III, the attending neurosurgeon and third physician to examine the plaintiff. *See* Trial Transcript, August 3, 1993, pp. 4–5, 16–17. Dr. Rosa supervised all of the care that Mr. Warren received at Georgetown University Hospital. *Id.* at 16–17.

Dr. Rosa also examined and interviewed the plaintiff. *Id.*, at 4–5, 16. Dr. Rosa said

that during the emergency room examination Mr. Warren was answering questions appropriately, doing the things that they asked him to do and that his mental status was "fine." *Id.* Dr. Rosa asked Mr. Warren what happened and recalled hearing from Mr. Warren about "being out jogging and falling, slipping, whatever, off this log and a stream." *Id.*, at 7.

Finally, the doctor who examined Mr. Warren upon the plaintiff's arrival by ambulance to the emergency room, Dr. Daniel Miller, also testified that Mr. Warren told him of jogging in Rock Creek Park and the attempt to cross.a creek by walking over a log. *See* Government Exhibit 60, Deposition transcript of Daniel L. Miller, M.D., July 22, 1993, (hereafter "Miller Dep.," at 12.[5] Mr. Warren told Dr. Miller that while walking over the log, Mr. Warren slipped and fell into the creek bed which lay approximately three to four feet below the log. *Id.* These facts were recorded by Dr. Miller after the examination in a progress note. *Id.*, at 12; Miller Dep. Exhibit 2; Government's Exhibit 31a, at p. 3.[6]

In argument, plaintiffs challenged the import of the foregoing testimony in primarily two respects. First plaintiffs argued that Mr. Warren's body temperature, recorded several hours after arrival at the hospital as approximately 91 degrees Fahrenheit, indicated that he was suffering from moderate hypothermia. Plaintiffs introduced expert testimony that moderate hypothermia may lead to confusion. Plaintiffs argued that Mr. Warren was confused in what he told his physicians and urged the Court to disregard the doctors' accounts of what they were told by Mr. Warren. The Court is not persuaded by this argument. The evidence shows that

---

**2.** The video deposition of Dr. Duma was taken *de bene esse* in Glendale, California, played in Court at trial on August 3, 1993 and received into evidence.

**3.** Dr. Duma explained that ordinarily in conducting a neurological examination he would run a "mini mental status examination" in which, for example, the patient is asked to spell a word backwards. However, when, like Mr. Warren, the patient is talking lucidly, with normal verbiage, such an exam is not necessary. *Id.*, at 12.

**4.** Dr. Duma's progress note reads in part: "60 y/o w m was in good health until tonite while

jogging, fell off a log into stream [about] 5 feet. No [loss of consciousness]."

**5.** The video deposition of Dr. Miller was taken *de bene esse* at the Mayo Clinic in Rochester, Minnesota, played in Court at trial on August 3, 1993, and received into evidence.

**6.** Dr. Miller's note reads in part: "60 yo w m was running in park when he attempted to cross a creek by walking over a log, he slipped and fell in the below creek [about] 4 ft....."

the treating physicians knew that Mr. Warren's body temperature was below normal. Nevertheless, they did not find that he exhibited symptoms of hypothermia, that he was confused in his thoughts or speech, or that his body temperature impeded his ability to convey detailed information to them. *See* Miller Dep., at 17; Duma Dep., at 29–30; and Tr., August 3, 1993 at 4–5, 16. Thus, whether or not moderate hypothermia *may* lead to confusion in a patient, none of Mr. Warren's treating physicians diagnosed such hypothermia or observed any such confusion. *Id.*

Next, plaintiffs suggest that because the stairs were constructed out of railroad ties which could also be referred to as logs, that the doctors merely confused Mr. Warren's attempt to relate that he fell from logs or log steps with a story of slipping off *one* log. The Court finds the possibility of such confusion to be improbable and unlikely, not only in light of the fact that the doctors observed Mr. Warren to be lucid and clear in his communication in every other respect, but because the physicians were specifically questioned on this issue. Each was asked whether Mr. Warren said he fell down stairs or log stairs and each said that Mr. Warren did not. Miller Dep. at 18; Duma Dep. at 30–31, 34; Rosa testimony, 8/3/93, at 17.

## II. Conclusions of Law

The Court does not welcome its duty to render this decision in light of the terrible injury suffered by Mr. Warren. The Court must find, however, that the plaintiffs did not sustain their burden to persuade the Court of the factual predicate to their legal claims. The evidence does not support the proposition that Mr. Warren fell from the stairs, but compels the conclusion that Mr. Warren fell off of the "log," or fallen tree that was stretched across the creek near the stairs. This accident, by itself, does not "impose liability or reveal proof of negligence." *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.1978). Furthermore, the Court

finds that in attempting to cross the creek by walking upon the fallen tree, the plaintiff assumed the risk of that activity and his injuries are not attributable to any negligence on the part of the defendants. For these reasons, the Court does not find for the plaintiffs and hereby dismisses the case with prejudice.[7]

The Clerk is directed to enter Judgment in accordance with this Opinion.

---

**7.** The government filed a post-trial motion to dismiss arguing that the plaintiff's suit under the FTCA is barred by the FTCA's Discretionary Function exception, 28 U.S.C. § 2680(a). Without considering the timeliness or substantive relevance of this motion at this stage of the case, the Court finds that the motion is moot in light of the factual conclusions reached by the Court based upon the evidence presented so painstakingly at trial.