DISTRICT OF COLUMBIA et al., a Municipal Corporation, Appellants,

v.

Thomas E. DAVIS et al., Appellees.

Thomas E. DAVIS et al., Appellants,

v.

DISTRICT OF COLUMBIA et al., a Municipal Corporation, Appellees.

Nos. 11597, 11598.

District of Columbia Court of Appeals.

Argued Nov. 21, 1977.

Decided May 19, 1978.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellants in No. 11597 and appellees in No. 11598.

John Lodge Euler, Washington, D. C., with whom John Lewis Smith, III, Washington, D. C., was on the brief, for appellees in No. 11597 and appellants in No. 11598.

Before NEWMAN, Chief Judge, and HARRIS and MACK, Associate Judges.

MACK, Associate Judge:

We are faced with cross-appeals following two trials upon a complaint against the District of Columbia for personal injury growing out of the accidental discharge of a revolver of an off-duty policeman. We are asked to review the propriety of the trial court's action in 1) directing a verdict for the city on the ground that the plaintiff had failed to establish negligent police training and supervision on its part and in 2) refusing to direct a verdict for the city under the plaintiff's theory of respondeat superior.

These appeals arise in the following factual context. On June 22, 1973, in the early evening hours, Thomas Edward Davis was a part of a small social gathering of about

four people at a residence in Northeast Washington. The group was joined by Edward Eugene Howard, a Metropolitan Police Officer. Shortly after entering the apartment Officer Howard was in the process of unholstering his regulation service revolver when the weapon discharged, striking Mr. Davis in the left thigh.

On May 12, 1975, Mr. Davis filed the instant action in Superior Court against Officer Howard and the District of Columbia. Count I of the complaint alleged negligence on the part of Officer Howard, and on the part of the District of Columbia under the doctrine of respondeat superior. Count II of the complaint charged the District of Columbia with having negligently failed to train, instruct, supervise and control the officer. A third count, asserted by Mr. Davis' wife for loss of consortium, was withdrawn when the wife died.

Trial commenced on May 17, 1976. At the close of the evidence the court granted the District of Columbia's motion for a directed verdict on the issue of its negligent supervision and training, on the ground that expert testimony was required regarding the adequacy of the police department's weapons training program. The court concluded that by not presenting such testimony, Mr. Davis had failed to establish a standard of care against which the jury could measure the actions of the corporate defendant. Thereafter, the case was submitted to the jury on the questions of Officer Howard's negligence in discharging the weapon, and the liability of the District of Columbia under the doctrine of respondeat superior. The jury's verdicts as to the District and the officer were irreconcilable, however. On Count I, the jury found in favor of Officer Howard, which implies a

finding of no negligence. However, the jury also returned a verdict in favor of Mr. Davis against the District of Columbia, which strongly implies, because of the derivative nature of the respondeat superior relationship, that Howard was negligent. Because of this inconsistency, the court ultimately granted a new trial as to these issues only.

At the second trial, commencing on August 30, 1976, after denying the District of Columbia's motion for a directed verdict, the court instructed the jury to find as a matter of law that Officer Howard was acting within the scope of his employment when the weapon was discharged.[1] On September 7, 1976, the jury returned verdicts against both the city and the officer.[2] The District of Columbia appealed that judgment, and Mr. Davis cross-appealed the directed verdict in favor of the District at the first trial on the issue of negligent supervision and training. We affirm both judgments.

I.

The preliminary question which confronts us before we may turn to a consideration of the merits is whether Mr. Davis' cross-appeal is properly before us.

 In this regard we note that Mr. Davis could not promptly appeal the directed verdict in favor of the District of Columbia on the issue of negligent supervision and training when granted because the court then granted a new trial. To be reviewable, a judgment or decree must not only be final but also complete, that is, final not only as to all parties, but as to the whole subject matter and all the causes of action involved. *Hunter v. Federal Life*

---

1. The court stated as follows: "At that point, I would instruct the jury as a matter of law under the circumstances, if under the circumstances of this case, if they find that Mr. Howard is liable, then the District of Columbia is liable also since Mr. Howard was carrying his weapon as an incident of his employment and pursuant to orders."

2. The court entered judgment for $23,891.95 against the District of Columbia after allowing a set-off of $6,108.75. The court awarded a judgment of indemnity in the amount of $35,-000 against Officer Howard in favor of the District of Columbia.

*Insurance Co.,* 103 F.2d 192 (8th Cir. 1939). Only after the second trial and the final judgment therein did there exist the requisite finality for appellate consideration. Although Mr. Davis did not specifically designate the record of the first trial pursuant to D.C.App.R. 10(b)(1), he did include the pertinent portions therefrom in his appendix. And when an appealable final judgment is entered, the appeal is generally held to bring up the entire record for review. *Taylor v. Washington Terminal Co.,* 133 U.S.App.D.C. 110, 112, 409 F.2d 145, 147 (1969).

We conclude, therefore, that the issue of propriety of the directed verdict in favor of the District of Columbia in the first trial is properly before us.

## II.

In taking this cross-appeal, Mr. Davis claims that at the first trial the court erred in not permitting the jury to consider the adequacy of the Police Department's training program with respect to the safe use of firearms. He contends that the following evidence supports his position.

Although Officer Howard is right-handed, when the shooting occurred he was wearing his service revolver in its holster on his left hip, tucked inside his pants with the handle and butt end facing forward. He had unfastened the holster's "keeper," the leather strap that snaps over the top of the holster to hold the revolver in place, and had pushed it behind the holster away from the weapon. Howard testified that he had grasped the handle of the weapon in order to draw it out of the holster when it discharged, although to the best of his knowledge his hand did not touch the trigger. None of the four other persons present in the room saw him begin to unholster the revolver.

Sergeant Robert D. Shupe of the Metropolitan Police Department, experienced in the handling and use of firearms and a supervisor of instructors at the departmental Training Academy, testified as to the comparative safety of a straight-draw and a cross-draw.[3] He stated that a straight-draw is generally safer since the weapon comes out of the holster in a direct line with its target. In a cross-draw, on the other hand, the weapon generally moves across a wider area in the course of the draw. He further stated, however, that a cross-draw does not increase the risk of accidental discharge, nor is it inherently more dangerous than a straight-draw when properly executed.

With respect to the use of the keeper, Sergeant Shupe testified that it was the safer practice, in the sense of minimizing the risk of accidental cocking and discharge, to wear the keeper fastened at all times to hold the gun in place.

The evidence revealed further that Officer Howard was appointed to the Metropolitan Police Department in May of 1971, and attended the Department Training Academy a short time later for a period of approximately sixteen weeks. In addition to the basic skills of marksmanship he was taught the various parts of his revolver and how to load, clean and store it. He was issued a right-handed holster and instructed to wear it on his right side. However, he received no written material of any kind with respect to the safe use, handling, or operation of his weapon. And after graduation he received no follow-up training regarding weapon safety. Finally, there were no published Police Department orders, regulations, instructions or manuals regarding the safe handling or wearing of service revolvers.

Mr. Davis claims that these factors of the assertedly minimal character of weapons safety training, lack of articulated departmental standards on the subject, and the fact that Officer Howard carried his revolver in a potentially more dangerous position

---

**3.** A straight-draw, as the term implies, would be that made by a right-handed person from his right hip. The right-handed Officer Howard executed a cross-draw from his left hip.

than that generally used, constitute sufficient evidence of the District of Columbia's negligent supervision and training to warrant the submission of that issue to the jury. He further contends that expert testimony would not have been required in order for the jury to be able to make such a determination.[4]

■ It is well established in this jurisdiction that the mere happening of an accident does not impose liability or reveal proof of negligence. *Ruml v. Giant Food, Inc.,* D.C. App., 290 A.2d 571 (1972); *Paylor v. Safeway Stores, Inc.,* D.C.App., 225 A.2d 312 (1967); *Brown v. Alabama Foods, Inc.,* D.C. App., 190 A.2d 257 (1963). The burden is on the plaintiff to establish (1) a standard of care, and (2) that a violation of that standard was the proximate cause of the injury. *Jones v. Safeway Stores, Inc.,* D.C.App., 314 A.2d 459 (1974).

■ With respect to establishing a standard of care, we conclude that the trial court did not err in deciding that expert testimony was required. Under the circumstances of this case, the questions of adequate weapons safety training and evaluation are technical questions not sufficiently within the common experience of jurors to obviate the need for expert testimony. *See Marusa v. District of Columbia,* (D.D.C. No. 1766–71, July 8, 1974).

Mr. Davis attempts to make the issue of negligent supervision and training appear to be an unlikely one for the use of expert testimony by characterizing it as simply a question of the use of ordinary care in the dissemination of important information. In other words, did the District of Columbia make an adequate attempt to educate Officer Howard as to the safe wearing and handling of his firearm? This, Mr. Davis contends, is not a question of such a scientific or technical nature as to require the use of expert testimony.

Mr. Davis' argument, however, is an oversimplification. The true thrust of his position is that the technical training received by police officers in the safe use and handling of firearms was inadequate. A determination on this point would require, among other things, an understanding of how the various weapons are assembled, the dangers inherent in their use, and the most effective method (whether field training, classroom instruction, the dissemination of printed material, or a combination of methods) of instructing the officers as to how to minimize those dangers.

■ It is clear that when the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, its clarification calls for the use of expert testimony. *Waggaman v. Forstmann,* D.C.App., 217 A.2d 310, 311 (1966). The test is whether such testimony would aid the trier of fact in the search for the truth. *Jenkins v. United States,* 113 U.S. App.D.C. 300, 306, 307 F.2d 637, 643 (1962). It can hardly be doubted that the instant case is one in which expert testimony would be of great value in aiding a jury in making its determination. Additionally, the decision whether or not to admit (and presumably to require) expert testimony is within the discretion of the trial court, whose ruling should be sustained unless clearly erroneous. *Ohio Valley Construction Co. v. Dew,* D.C.App., 354 A.2d 518 (1976). We cannot find that the trial court improperly concluded that the required extent of an acceptable program in the area of weapons

---

4. With respect to this issue the trial court concluded that:

> It is my view that the matter of weapon safety and training program is designed for the purpose of educating members of the Police Department and the matter or area of weapon safety is the kind of specialized matter which requires the exercise of professional judgment not within the common experience of jurors. And I feel that it was incumbent upon the plaintiff [Mr. Davis] to prove the standard of care or performance to which the defendant District of Columbia is to be held and to prove a departure from that standard. And the plaintiffs have, considering all the evidence, failed to do so.

safety is a matter which laymen are incapable of intelligently evaluating without the assistance of expert testimony.[5]

On the question of causation, Mr. Davis fares no better. His evidence on this point consists solely of his reiteration of the facts that Officer Howard wore his holster on his left hip although he is right-handed, and unfastened the keeper on his holster. He further points out that he was standing to the left of Officer Howard when shot. He argues, based on this fact, that since the proven danger of the right-handed cross-draw is that during the draw the pistol barrel swings from left to right, by standing to the left he was within the range of that arc. Mr. Davis contends, therefore, that had the revolver been on the officer's right hip, and been removed with a straight-draw, he would not have been hit. He concludes that these facts provide an independent basis upon which a jury could find that the District of Columbia was negligent.

The record is clear, however, that Officer Howard was aware of the function of the keeper, and had been told to keep it fastened. In fact, he told the police officer who investigated the incident that he had been wrong in leaving it unfastened. Officer Howard was also aware of the proper position in which his holster should be worn, because he was issued a right-handed holster and told to wear it on his right side. That he was not wearing his weapon in the position in which he was instructed to wear it, and was aware of that fact, does not reflect on the adequacy of his training.

An unsupported, conclusory allegation as to the adequacy of the District's weapons

training program is patently insufficient to establish a prima facie case on the issue of causation. Although it may be urged that, as the plaintiff, Mr. Davis was entitled to the benefit of all logical inferences, the jury may not be allowed to engage in idle speculation. *Jones v. Safeway Stores, Inc.*, *supra*. "Speculation is not the province of a jury, for the courts of this jurisdiction have emphasized the distinction between logical deduction and mere conjecture." *Kincheloe v. Safeway Stores, Inc.*, D.C.App., 285 A.2d 699, 701 (1972).

We conclude, therefore, that the directed verdict in favor of the District of Columbia on the issue of negligent supervision and training was properly granted.

### III.

The District of Columbia contends that Officer Howard was not acting within the scope of his employment at the time and place of Mr. Davis' injury, and that because he was not, a directed verdict should have been granted in its favor at the close of the evidence adduced at the second trial. We disagree.

In the instant case, the revolver discharged in a private apartment while Officer Howard was in the process of unholstering it in order to take a shower. Officer Howard was not on duty at that time, nor had he been on active duty that day. There is some dispute as to whether he planned to put his gun back on when he dressed. At the first trial, Officer Howard indicated that he did not intend to resume wearing his revolver.[6] At the second trial, on the

---

5. *See, e. g., Peer v. City of Newark,* 71 N.J.Super. 12, 176 A.2d 249 (Super.Ct.App.Div.1961), an action against a police officer and the city for injuries received by a girl who was struck by a bullet when the officer's gun discharged while he was off-duty. The basis of the claim against the city was that it inadequately trained or instructed the officer in the use of the .38 calibre police service revolver. On appeal, the court found that the case was properly allowed to go to the jury based on the testimony of two

expert witnesses in the field of firearms, firearm safety, and police training, each with "vast and varied experience." *Id.* at 252.

6. On direct examination during the first trial, Officer Howard testified as follows:

Q. You were planning to go to the concert?
A. Yes.
Q. Did you plan to take your gun to the concert?
A. No. The first one I didn't, no.

other hand, his testimony was somewhat more equivocal.[7]

In any case, it is undisputed that Officer Howard was wearing the service revolver issued to him pursuant to specific departmental regulations. The following regulations, *inter alia,* governed the conduct of Metropolitan Police Department Officers on the date of the occurrence:

Metropolitan Police Department Manual

2:1:4 Members of the force are held to be always on duty, although periodically relieved from the routine performance of it; are always subject to orders from the proper authorities and to call from citizens; and the fact that they may be technically off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring such action.

\* \* \* \* \* \*

2:3:1 Members of the force, when off duty any place in the District of Columbia, except in their residences, shall carry their badges, identification cards and service revolvers at all times.

2:3:2 When off duty and not in full uniform, members of the force shall wear their service revolvers in such a manner as to conceal them from view.

Q. I didn't understand you, sir.
A. Well, the first concert I went to, no I did not take it. So, I doubt if I would have took it then.
Q. Did you wear your gun when you were off-duty?
A. Yes, sir, I do.
Q. Were you required to wear your gun when you were off-duty?
A. Yes, sir, I am.
Q. Are you telling me that you would not have taken your gun to the concert?
A. No, sir, I don't believe that night I would have.
Q. Would that have been in violation of regulations?
A. Yes, sir, it would have.
7. BY MR. O'CONNELL [Attorney for the officer]:
Q. Officer Howard, \* \* \* Police regulations require you to wear that gun at all times when you are in the District of Columbia ex-

The crux of Mr. Davis' position is that since Officer Howard was wearing his revolver because he was required to do so by departmental regulation in order to be always available for duty, the act of carrying and unholstering the weapon was itself a police activity within the scope of his employment. This precise question has never been addressed by this court, and requires a careful consideration of the current scope of the doctrine of respondeat superior.

█ It is settled that the District of Columbia may be sued under the common law doctrine of respondeat superior for the torts of its police officers acting within the scope of their employment. *Wade v. District of Columbia,* D.C.App., 310 A.2d 857, 863 (1973). And, in addition to those cases specifically involving police officers, there is another line of cases holding that an employer is liable for the negligence of his employee if at the time of the negligent act the employee is acting within the scope of his employment even where the employee injures a third person while disobeying his master's orders. *Meyers v. National Detective Agency, Inc.,* D.C.App., 281 A.2d 435 (1971), citing *Schweinhaut v. Flaherty,* 60 App.D.C. 151, 49 F.2d 533 (1931). Thus, the liability of employers extends to cases where the employee's ˙negligent acts are contrary to the given instructions, so long

cept when you are in your own home; is that true?
A. That is true.
Q. Is that the reason why you were wearing it that particular day?
A. Yes.
Q. And the reason you took it off, so you could take a shower?
A. Yes.
Q. And you were going to Kennedy Stadium that night?
A. Yes.
Q. You would have to put the gun back on?
A. Yes, sir.
Q. And carry it to Kennedy Stadium?
A. Yes.
Here, it appears that Officer Howard was merely indicating what he would have to do to comply with departmental regulations, not what he intended to do.

as the employee was acting within the scope of his employment. *Presley v. Commercial Credit Corp.,* D.C.Mun.App., 177 A.2d 916 (1962).[8] It has been said that the true test of whether an employer is liable for the act of his employees is whether at the time of the commission of the injury the employee was performing a service in furtherance of his employer's business, not whether it was done in exact observance of the detail prescribed by the employer. *Pacific Telephone & Telegraph Co. v. White,* 104 F.2d 923 (9th Cir. 1939). It appears, then, that the District of Columbia could not escape liability because Officer Howard was wearing his weapon improperly holstered, provided that he was acting within the scope of his employment. It now becomes necessary to determine whether his action was indeed one within that scope.

The scope and course of employment means the range or extent of the work to be performed by an employee within the limitations of his authority. *Presley v. Commercial Credit Corp., supra* at 918. *See also* Restatement (Second) of Agency § 228 (1957). An act is not within the scope of employment if done for the employee's purposes only; unless the tort occurred at least in part as a result of a desire to serve the employer, the employer is not liable. *Park Transfer Co. v. Lumbermens Mutual Casualty Co.,* 79 U.S.App.D.C. 48, 142 F.2d 100 (1944). Further, the employee's conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. *Presley v. Commercial Credit Corp. supra.*

Here, Officer Howard was carrying a weapon because he was required to do so.

By wearing it at all times, he was furthering his employer's function of maintaining public order. Simply by having a weapon on his person, Officer Howard was acting as a deterrent to disorder. The weapon was necessary to his carrying out the mandate of his employer that he be in a constant state of readiness to take official action. The act of unholstering it was surely conduct incidental to that authorized. *See, e. g., Lancaster v. Canuel,* D.C.App., 193 A.2d 555 (1963).

Several factors have been held to be useful in determining the existence of an employer-employee relationship with respect to specific acts. A critical one is whether the employer at the time had the right to control and direct the employee in the performance of his work. *LeGrand v. Insurance Co. of North America,* D.C.App., 241 A.2d 734, 735 (1968), citing *Dovell v. Arundel Supply Corp.,* 124 U.S.App.D.C. 89, 90, 361 F.2d 543, 544 (1966). Had there been a disturbance in the area, there is no doubt that Officer Howard could have been compelled to respond to it, in spite of the fact that he was technically off-duty.

Another factor is that of the employee's state of mind. In *Great A & P Tea Co. v. Aveilhe,* D.C.Mun.App., 116 A.2d 162, 165 (1955), this court concluded that an employee's state of mind at the time the act is committed is material, though not conclusive, in determining whether the act is committed within the scope of his employment. Officer Howard's testimony on cross-examination indicated his awareness of the fact that he was, for certain purposes, effectively on duty at all times.[9]

Recent cases in this and other jurisdictions indicate a trend toward the more lib-

---

8. *See also Baltimore & O. R. Co. v. Papa,* 77 U.S.App.D.C. 202, 203, 133 F.2d 413, 414 (1943); *Dilli v. Johnson,* 71 App.D.C. 139, 107 F.2d 669 (1939).

9. Officer Howard testified as follows:

Q. Officer, are you familiar with the regulation that says members of the Force are held to be always on duty?

A. Yes, sir.

Q. And I take it from your answer to some of Counsel for the Government's questions that

you are familiar with the fact that at some times, police officers, including yourself, are referred to as being off-duty?

A. Yes.

Q. Do you understand how that is possible?

A. Yes, sir, I kind of understand it.

Q. Will you explain it to me, please?

A. I think being off-duty would be considered not you know, working an eight hour tour of duty; for myself, riding around in a scout car for eight hours, and an off-duty status would mean being relieved of that.

eral application of the doctrine of respondeat superior. In a case in circuit court, where the defendant trucking company's deliveryman disputed with the plaintiff at the plaintiff's home over whether the deliveryman should accept a check instead of cash, and the deliveryman then raped and cut the plaintiff, it was held to be a question for the jury as to whether the assault stemmed from purely personal reasons or arose out of the conduct of the trucking company's business, and if the latter, the trucking company was liable as the employer. *Lyon v. Carey,* 174 U.S.App.D.C. 422, 533 F.2d 649 (1976). The court concluded that although the assault was perhaps at the outer bounds of respondeat superior, the case was properly one for the jury.

With respect to the specific issue of police torts, two New York cases are noteworthy. In *Collins v. City of New York,* 11 Misc.2d 76, 171 N.Y.S.2d 710 (Sup.Ct.1958), an off-duty officer stumbled on a subway platform and dropped a paper bag containing his revolver, which discharged and struck the plaintiff. The New York Court of Appeals held that where police regulations required the policeman to carry the revolver when off-duty in order to be available for emergency service (even though carrying the weapon in a paper bag was a clear violation of departmental regulations), the city was liable for the policeman's negligent handling of the revolver. The court's rationale was as follows:

> [T]he off-duty policeman is required to be available to perform in his employer's behalf at all times even though technically off duty. The fulfillment of this obligation to be available for service and to be prepared for service constitutes positive performance of the requisites of the policeman's employment. Such performance even in a negligent or imperfect manner contrary to the warrant of [the statute] . . . does not refute, alter or terminate the intrinsic character and nature of the act. . . . [*Id.* at 78, 171 N.Y.S.2d at 713.]

That court has recently reinforced its position in *Kull v. City of New York,* 32 N.Y.2d 951, 347 N.Y.S.2d 205, 300 N.E.2d 736 (1973). In that case, an off-duty policeman placed his revolver on top of a television set in his apartment while he was dressing. The infant plaintiff found the gun and accidentally shot himself in the leg. Citing *Collins, supra,* the court noted that the city's regulations required that the patrolman be available for duty at all times and that they carry a revolver at all times; it concluded that under these circumstances it could not be said that the patrolman's actions in handling his revolver were not in furtherance of his employer's interests.[10]

▮ Though technically within the off-duty classification, Officer Howard was en-

Q. But wouldn't you consider to have the same duty to me and any members of this panel and all of the others in the courtroom, His Honor, if we are attacked on the street, the same duty whether you were on or off-duty?
A. Yes, sir.
Q. And wouldn't you be just as much subject to orders of your superior officers whether you were always on duty or in an "off-duty" status?
A. Yes, sir.
Q. So the fact is, members of the Force are always on duty in those two senses; aren't they?
A. Yes, sir.
Q. And the fact is that forgetting about duty and forgetting about police work that may have been needed in the area, crimes being committed in the area of Eastern Avenue or incidents, you had to have your gun not because some-

thing was happening but because something might in the view of whoever promulgated the regulations happened; isn't that true?
A. Yes, it was a
Q. It was a preventionary requirement; was it not?
A. Yes sir.
MR. SMITH: Thank you.

**10.** The District of Columbia relies heavily on the Tennessee case of *Nishan v. Godsey,* 166 F.Supp. 6 (E.D.Tenn.1958). That case also involved an action for injuries sustained as a result of the accidental discharge of a pistol by a city policeman. Though not actually on duty, Godsey was returning from a conference with the Chief of the City's Fire Department when he stopped at a filling station and engaged in horseplay with the plaintiff; plaintiff placed his hand on Godsey's gun and accidentally dis-

gaged in the execution of a function specifically prescribed by the city—carrying a gun—and the performance of the requirement, though negligent, was nevertheless in furtherance of the interests of the employer. We conclude, therefore, that the city is liable for the consequences of such acts. To hold otherwise would place upon an innocent victim the loss associated with the city's placing a dangerous weapon in the hands of an officer on a round-the-clock basis. The regulation requiring officers to carry their guns at all times is for the benefit of the public; therefore, it is reasonable that the public, through the municipality, bear the monetary risk of negligent injury to innocent persons resulting from that requirement.

Our decision would not place the city in the position of an insurer, nor does it reflect a rationale that every conceivable discharge of a revolver in an officer's possession is undertaken in the scope of employment. The victim in such a case would still bear the burden of proving negligence.

## IV.

Our final determination is whether the trial court erred in instructing the jury that Officer Howard was acting within the scope of his employment as a matter of law. We conclude that it did not.[11]

Since it was undisputed that Officer Howard was wearing his service revolver pursuant to specific departmental regulations, the trial court acted properly in declining to submit the question to the jury and in treating it as an established fact. Furthermore, since the inference is clear that Officer Howard was acting within the scope of his employment, based on our aforegoing discussion, *see* Part III, *supra,* we cannot find that the court erred in making that determination as a matter of law. *See Arndt v. Mitchell Cadillac Rental, Inc.,* 115 F.Supp. 533 (D.N.J.1953).

Accordingly, the judgments appealed from are

*Affirmed.*

charged it. The court found the doctrine of respondeat superior to be inapplicable.

We note, first of all, that Officer Godsey was subject to no written departmental regulations requiring him to carry his gun at all times. Secondly, Officer Godsey at the time of the incident was engaging in reckless "horseplay,"

a strong indication that the act was done for his purposes only. *See Park Transfer Co. v. Lumbermens Mut. Cas. Co., supra.*

11. We note, in this regard, that the District of Columbia did not object to the instruction when given.