Willie **VARNER**, et al., Appellants,

v.

**DISTRICT OF COLUMBIA,**
et al., Appellees.

No. 04–CV–488, 04–CV–547.

District of Columbia Court of Appeals.

Argued Dec. 7, 2005.

Decided Feb. 2, 2006.

tember 19, 2005.

Barry J. Nace, Washington, for appellants.

Mary T. Connelly, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for the District of Columbia.

Susan M. Cook, Washington, with whom Steven J. Routh was on the brief, for appellee Gallaudet University.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

Willie and Diane Varner appeal from an order granting summary judgment in favor of defendants Gallaudet University and the District of Columbia[1] in the wrongful death and survival action brought against these defendants following the murder at Gallaudet University of the Varners' son, Benjamin Varner. We conclude, as did the trial court, that the Varners' evidence, viewed in the light most favorable to them, did not establish a standard of care applicable to the University or the breach of such a standard, that no genuine issue of material fact was presented, and that the University was entitled to judgment as a matter of law. We further conclude that the trial judge did not err in granting summary judgment in favor of the District on the basis of the public duty doctrine. Accordingly, we affirm.

## I.

### THE TRIAL COURT PROCEEDINGS

Most of the principal historical facts relevant to these appeals are undisputed.

---

1. The Varners also joined Detective Kyle Cimiotti as a defendant. In this opinion, we refer to the District of Columbia and Detective Cimiotti collectively as "the District."

Gallaudet University is an educational institution in Washington, D.C., for students who are deaf or hard of hearing. At the time of his death, Benjamin Varner was a freshman at the University, and he resided on campus at Cogswell Hall.

On September 28, 2000, Eric Plunkett, another student living in Cogswell Hall, was murdered in his room. Plunkett had cerebral palsy and, unable to defend himself from an unexpected attack, he was beaten to death. It was subsequently established that Plunkett's killer was his fellow-student, Joseph Mesa, and that Mesa murdered both Plunkett and Varner. Following Plunkett's death, however, the police arrested freshman Thomas Minch and accused Minch of the murder. Minch had come under suspicion because he had allegedly accused Plunkett of making sexual advances on him. Detective Cimiotti claimed at the time that Minch had confessed to the murder. The United States Attorney declined to file charges against Minch, however, and Minch was released from custody. Nevertheless, Minch remained under suspicion, and he was suspended by the University. It was later discovered that Mesa had stolen Plunkett's credit card and had used it to make purchases, but the police, believing that Minch was responsible, did not attempt to determine whether the murder was related to a theft.

On February 3, 2001, Benjamin Varner was stabbed to death in his room. The police promptly discovered that Varner's checkbook had been stolen, and the use of the checks was traced to Mesa. Mesa was arrested and acknowledged his guilt, and he was subsequently convicted of both murders.

On December 11, 2001, Varner's parents filed suit against the University and the District,[2] alleging that both defendants had been negligent. The Varners' principal allegations against the University were

1. that the University was negligent in allowing Mesa to be on campus and by failing to expel him in 1999, after it had been determined that Mesa had committed a number of major thefts and other offenses, and that this negligence on the University's part put Benjamin Varner and other students at risk of bodily harm;[3] and

2. that the University was negligent in its security procedures following Plunkett's murder, thereby proximately causing Benjamin Varner's death.

The Varners further alleged that after the Plunkett homicide, the police provided assurances to Gallaudet students, including Benjamin Varner, that they would receive special protection, that their security would be accorded the highest priority, and that it was therefore safe for them to remain in school. According to the Varners, Benjamin and other students relied on these assurances.

Following extensive discovery, the District and Gallaudet filed separate motions for summary judgment. On April 8, 2004, in an eleven-page written order, the trial court granted both motions. The Varners filed a timely appeal.

## II.

### SUMMARY JUDGMENT STANDARD

■ In order to be entitled to summary judgment, a moving party must show

2. The Varners also sued Mesa, who defaulted.

3. The University's Coordinator of Student Judicial Affairs ruled that Mesa should be suspended for two years. Mesa appealed to the Dean of Students, who reduced the sanction to suspension for one year. Following his suspension, and notwithstanding a staff recommendation to the contrary, Mesa was permitted to live in a student dormitory.

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(c). We review the trial court's judgment *de novo, Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994), and we apply the same substantive standard on appeal as does the trial court in initially considering the motion. *Fry v. Diamond Constr., Inc.,* 659 A.2d 241, 245 (D.C.1995). The record is viewed in the light most favorable to the party opposing the motion. *Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991). "Summary judgment is proper when a party fails to establish an essential element of his case upon which he bears the burden of proof." *Pannell v. District of Columbia,* 829 A.2d 474, 478 (D.C.2003).[4]

### III.

### THE JUDGMENT FOR THE UNIVERSITY

A. *The University's failure to expel Mesa.*

(1) *The contentions of the parties.*

■ "In an action for negligence, the plaintiff has the burden of proving by a preponderance of the evidence the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *District of Columbia v. Wilson,* 721 A.2d 591, 597 (D.C.1998) (citing *District of Columbia v. Watkins,* 684 A.2d 395, 401 (D.C.1996)). The Varners' principal claim against the University is that by failing to expel Mesa for theft and other misconduct, or to suspend him for a longer period, the University caused him

to be present on the campus and in a position to murder Benjamin Varner (as well as Eric Plunkett). In particular, the Varners assert that the University's decision in 1999 to suspend Mesa for one year (rather than to expel him) for thefts of several thousand dollars violated the applicable standard of care and proximately caused Benjamin Varner's death. The University contends that the Varners' evidence, viewed in the light most favorable to them, did not demonstrate the existence of an applicable standard of care or the breach of any such standard, that no genuine issue of material fact was raised in regard to the University's negligence, and that the University is entitled to judgment as a matter of law. We agree with the University.

(2) *The need for expert testimony.*

■ The Varners first assert that the question whether the University was negligent was not "beyond the ken" of the average lay person, *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988), and that therefore no expert testimony was required. "Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 200 (D.C.1991) (citations omitted). The Varners point out that Mesa had been disciplined for various acts of misconduct beginning in 1995 when he was attending the high school affiliated with Gallaudet; that he had been re-

4. We have recently had occasion to articulate the summary judgment standard in substantially greater detail. *See Virginia Acad. of Clinical Psychologists v. Group Hospitalization, Inc.,* 878 A.2d 1226, 1232 (D.C.2005); *Weakley v. Burnham Corp.,* 871 A.2d 1167, 1173 (D.C.2005). We adhere to the principles expressed in these decisions, but do not repeat them here.

peatedly warned that further misconduct could result in dismissal; and that prior to his suspension in 1999, among other crimes, he had stolen $3,000 from his roommate by misappropriating the victim's ATM card. The Varners also rely on the enumeration, in the University's student handbook, of specific acts of misconduct that, "because of the immediate or eventual jeopardy they pose to human life and/or University property, will more than likely result in automatic and immediate dismissal":

1. activating a false fire alarm or bomb threat

2. tampering with fire apparatus

3. acts of vandalism

4. theft

5. physical assault and battery

6. possession of firearms, explosives, other weapons, or dangerous chemicals

7. other serious offenses as determined by the administration

Pointing out that by 1999, Mesa had committed almost all of these infractions, including repeated thefts, the Varners assert that, even without expert testimony, a genuine issue of material fact was presented as to whether the University failed to exercise reasonable care in deciding not to expel Mesa, or (at least) in permitting him to reside on campus in a student dormitory.

At first blush, there is arguably some common sense appeal to the Varners' suggestion that the average juror does not require advice from experts from academe in order to be able to identify repeated major thefts as misconduct warranting expulsion, or, at least, exclusion from on-campus dormitories. There can be no doubt that, had Mesa been criminally prosecuted for and convicted of some of his misdeeds, he would have faced the prospect of incarceration, perhaps for several years. The precise question here, however, is whether the trial judge committed reversible error in holding that a lay juror could not be expected to determine whether the result of the University's disciplinary process was unreasonable. Mesa was suspended for a year, but not expelled, and the Varners' claim that a lay jury is entitled to override the University's judicial process and rule that this substantial suspension was inadequate and violated the applicable standard of care.

■ The decision whether to admit or require expert testimony on a particular state of facts is confided to the sound discretion of the trial court, and we have described that discretion as "broad." *District of Columbia v. White*, 442 A.2d 159, 165 (D.C.1982); *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.1978). In *Davis*, the trial court ruled that expert testimony was required to prove that the District had negligently trained and supervised a police trainee in the use of his service revolver, and that the plaintiff was injured as a result of this negligence. We affirmed a directed verdict in the District's favor, holding that "the decision whether or not to admit (and presumably require) expert testimony is within the discretion of the trial court, whose ruling should be sustained unless clearly erroneous." *Id.* at 1200. The Supreme Court has likewise held that "[t]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). We have stated that our deference to the trial judge's decision whether to require expert testimony does not differ from our deference to a ruling as to the admissibility of such evidence. *White*, 442 A.2d at 165; *Davis*, 386 A.2d at 1200.[5]

■ In this case, the trial judge did not err or abuse his discretion in holding that, without expert testimony, there was insufficient evidence of negligence to present a jury question. Just as courts should not leave it "to a jury of tailors and haberdashers to pass judgment unaided by expert testimony on how to make a wet and rolling deck in a seaway a safe place to work," *Beard*, 587 A.2d at 200 (quoting *Zinnel v. United States Shipping Bd., E.F. Corp.*, 10 F.2d 47, 49 (2d Cir.1925) (dissenting opinion)), so the trial court could reasonably conclude that questions as to the appropriateness and sufficiency of academic discipline should not be left to a lay jury to decide without expert testimony.

This court has held, in a substantial number of cases presenting a variety of factual scenarios, that on the particular record before the court, the determination that a defendant was negligent was beyond the ken of a lay jury, and that the plaintiff must present expert testimony to establish the standard of care and its breach. *See, e.g., Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C.2000) (expert testimony required to show that a leaning tree created a dangerous situation requiring an emergency response); *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433–34 (D.C.2000) (plaintiff required to present expert testimony to establish standard of care for operation and maintenance of a municipal water main system); *Clark v. District of Columbia*, 708 A.2d 632, 634–35 (D.C.1997) (expert testimony necessary to establish standard of care applicable to District officials operating juvenile deten-

tion center, where juvenile in custody committed suicide); *District of Columbia v. Hampton*, 666 A.2d 30, 35–36 (D.C.1995) (in negligence action against the District, brought after a two-year-old child died in foster care as a result of foster parent's alleged negligence, plaintiff must present expert testimony to establish standard of care for selection and supervision of foster parents); *Beard*, 587 A.2d at 200 (proof of objective standard of care to which retail merchants should be held in processing applications for credit cards requires expert testimony); *but cf. District of Columbia v. Shannon*, 696 A.2d 1359, 1365 (D.C.1997) (expert testimony not required where minor's thumb was severed in playground accident due to holes in playground equipment).

Significantly, this court has affirmed trial court rulings that expert testimony is required to establish the standard of care in negligence cases such as this one, which involve issues of safety, security and crime prevention. *See, e.g., Clark*, 708 A.2d at 634–35; *Hampton*, 666 A.2d at 35–36. In *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906 (D.C.2001), the plaintiff was injured when, while leaving an inauguration ceremony for an official of the NAACP, she was caught in a rush of people on a crowded stairway. The plaintiff failed, however, to proffer expert testimony regarding the applicable standard of care for crowd control. In affirming an award of summary judgment in favor of the church at which the ceremony was held, this court stated that

> [n]o doubt attendance at large gatherings of many types—religious services, graduation ceremonies, sporting events,

---

5. In several of our decisions, however, without citing *White* or *Davis*, we have simply stated that expert testimony is required, or that we agree with the trial court that such testimony is required, without specifying a standard of review. *See, e.g.*, cases cited at pp. 266–67, *infra*. In any event, in this case, we would reach the same result under a *de novo* standard as we do in reviewing for abuse of discretion, although the question would then be a closer one.

theatrical performances, and so on—and the process of entering and exiting from the relevant locales are events within common knowledge and experience. But that is a far cry from any experience with the process of planning for the handling of large crowds in such circumstances, both architecturally and through various crowd control measures.

*Id.* at 910. In light of these authorities, we conclude that the judge did not err in holding that in this case, proof of the applicable standard of care or its breach required expert testimony.

### (3) *The sufficiency of the expert testimony.*

In the alternative, the Varners contend that, even if expert testimony was required in order to establish the applicable standard of care regarding the University's failure to expel Mesa, they satisfied this requirement with the deposition testimony and affidavit of Dr. Timothy F. Brooks. At the time of his deposition testimony, Dr. Brooks was the Dean of Students at the University of Delaware, having served in that capacity for over twenty years. Dr. Brooks testified as an expert on the subject of the disciplining of students for wrongdoing against other students, and about the responsibilities of universities in this regard.

■ In his deposition and, especially, in his subsequent affidavit,[6] Dr. Brooks was extremely critical of Gallaudet's handling of Mesa's case. In his affidavit, he stated, *inter alia:*

In my opinion, the judicial system of Gallaudet was not typical of judicial systems across the country; it was poor policy, and not in keeping with the accepted practice or within the standard of care.

\* \* \* \* \* \*

In my opinion, it was a gross breach of the required duties and the standard of practice for Gallaudet to suspend Joseph Mesa for only one year.

Other than his own personal opinion, however, Dr. Brooks was unable to suggest any recognized standard, written or oral, which addressed the question whether imposition of a one-year suspension was unreasonable in a case such as Mesa's. Indeed, Dr. Brooks acknowledged, under examination by counsel for the University, that he knew of no such standard:

Q: Is there any standard stated orally or in writing that you're aware of that required—would have required expulsion of Mr. Mesa in the spring of 1999?

A: If you're looking at a written national standard, no.

\* \* \* \* \* \*

Q: Is there any written standard other than a national standard that you think requires expulsion of Mr. Mesa in the spring of 1999?

A: Not that I'm aware of.

\* \* \* \* \* \*

Q: Is there something you could point to and say, even though it's not written, it was everyone's agreement at the conference on student affairs, and we took a

---

**6.** The filing of an affidavit by a witness who has previously testified at a deposition sometimes encounters judicial disfavor, especially where the affidavit contradicts some of the deposition testimony. *See Hancock v. Bureau of Nat'l Affairs,* 645 A.2d 588, 590–91 (D.C. 1994); *cf. Hinch v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries* *Conducting Sibley Mem'l Hosp.,* 814 A.2d 926, 929–31 (D.C.2003). Because we decide the case on other grounds, we need not resolve any issue raised by the University's criticism of and disenchantment with the Varners' use of post-deposition affidavits by their expert witnesses.

voice vote? I just want to make sure. If there's some basis you can point to other than you're saying it is this way because you know it—is there any other standard you can point to that required expulsion of Mr. Mesa in the spring of '99?

A: Not that I can think of.

The foregoing questions were not ones that it should have been impossible for Dr. Brooks to answer. The witness claimed, remarkably, that he had handled about 20,000—twenty thousand!—"judicial" cases involving students during his twenty-five-year university career.[7] He was a board member of the Association of Student Judicial Affairs, the principal national organization which deals with student discipline. Many hundreds of the cases which Dr. Brooks handled, or with which he otherwise became familiar—indeed, thousands of such cases—must surely have involved thefts. Nevertheless, Dr. Brooks offered no statistics or estimates as to how thefts by students were handled in various institutions, nor did he identify a norm. He likewise failed to articulate any particular criteria on the basis of which a choice between expulsion and suspension was generally made, or ought to be made.

Thus, the only standard offered by Dr. Brooks was his own opinion, unfavorable to Gallaudet, though he also obviously believed that others in his profession would have agreed with his opinion.

█ We have repeatedly held that such testimony is insufficient. Especially in circumstances in which, as in this case, the defendant is alleged to have failed to protect the plaintiff from harm, the expert must "clearly articulate *and reference* a standard of care by which the defendant's actions can be measured." *See, e.g., Clark,* 708 A.2d at 635 (emphasis in original); *District of Columbia v. Carmichael,* 577 A.2d 312, 314–15 (D.C.1990).[8] Dr. Brooks referred to no such standard, and his testimony would not enlighten the jury as to what the practice was at other universities with respect to suspension or expulsion, what criteria are or ought to be used in order to make that choice, or how Gallaudet's actions compared with any national standard or norm.

█ Nor can the Varners prevail on the basis of the provisions in the Gallaudet Handbook,[9] to which Dr. Brooks also referred, in order to defeat summary judgment. In *Clark,* 708 A.2d at 636–37, this court held that violations of procedures

---

7. This breaks down to approximately eight hundred cases a year (or about sixteen a week, dubiously assuming a fifty-week academic year, or twenty a week, more credibly assuming a forty-week academic year).

8. We have made it clear that "[t]he protection of an individual from himself, or from the criminal conduct of third parties, presents issues different in kind from those that arise in a medical malpractice case," and that in "protection from harm" cases like *Clark,* 708 A.2d at 635–36 (and the present case), we apply more "exacting standards" in evaluating the sufficiency of expert testimony. *Wilson,* 721 A.2d at 600.

9. The University argues that it did not violate the policies in its Handbook. The Handbook

states, *inter alia,* that acts of theft will "most likely" result in dismissal. A "dismissal," according to the University, may be either a suspension or an expulsion, with the latter also being referred to as a *"permanent* dismissal." (Emphasis added.) Therefore, according to the University, Mesa's one-year *suspension conformed to the policies in the* Handbook.

The soundness of this argument is not obvious. One who reads the relevant language of the Handbook in a non-technical manner might well receive the impression that Mesa was treated a good deal more leniently than the authors of the Handbook contemplated. As we note in the text, however, the Handbook does not represent a standard of care.

prescribed by an agency's internal manual—in that case, the District's Suicide Prevention Plan—while arguably admissible as evidence of the standard of care, are not sufficient to require that the defendant's motion for a directed verdict be denied, for a defendant "cannot be held liable for aspiring to efforts beyond an applicable national standard." Similarly, in this case, assuming that the punishment meted out to Mesa was less severe than that suggested in the Handbook, that fact is insufficient to defeat summary judgment. *See Beard*, 587 A.2d at 199 ("the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed verdict") (citations omitted).

■ The Varners also assert on appeal that Gallaudet was negligent in permitting Mesa to live in a dormitory following his return to campus after his suspension. The point is not frivolous; arguably, thieves should not be permitted to live in dormitories, even when a year or more has elapsed since the thefts. One might reasonably ask whether the other residents of the dormitory were not entitled to a warning that a former thief was in their midst. Although the issue is not an easy one, however, we conclude that the trial judge did not err in his disposition of this issue.

The expert evidence presented by the plaintiffs on this aspect of the case was legally insufficient. During his deposition, the Varners' expert on disciplinary matters, Dr. Brooks, failed to articulate or identify any established standard prohibiting a student from living in a dormitory upon the end of his suspension, even if that suspension was for theft. In his supplemental affidavit, Dr. Brooks likewise failed to identify a single university that would have prohibited Mesa from living on cam-

pus under the circumstances. Rather, Dr. Brooks simply concluded that Gallaudet's decision to permit Mesa to return to a dormitory was "below the standard of care." Such a conclusory assertion is insufficient to establish an objective standard of care. *See, e.g., Pannell*, 829 A.2d at 479–80.

■ Finally, the disciplining of students by universities is an area in which we are obliged to tread carefully and exercise restraint. "Courts must enter the realm of school discipline with caution and allow schools flexibility in establishing and enforcing disciplinary procedures." *Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 747 A.2d 205, 209 (2000) (citations omitted). Just as "[p]ublic policy considerations undergird the deference accorded [an] academic institution in grading its students," *Jung v. George Washington Univ.*, 875 A.2d 95, 108 (D.C.2005), so too courts must respect the authority of a university to select the appropriate discipline to be meted out to a student who has violated the university's rules. In this case, when Mesa's thefts were discovered, the University's security officers promptly reported them to the Metropolitan Police Department (MPD), but at the complainant's request, the police took no action. The University also immediately instituted disciplinary proceedings against Mesa for theft. As we have previously explained, see note 3, *supra*, Mesa was originally suspended for two years; the Dean of Students reduced the suspension to one year based on Mesa's cooperation and his reimbursement of his victims. The University obviously took seriously its responsibility to take disciplinary action; the Varners' quarrel is only with the sanction that the University imposed.[10] Under

---

10. In his affidavit, Dr. Brooks opined that, in his view, a four-year suspension might

have been adequate. There is no indication in the record as to how he arrived at four

these circumstances, the need for judicial restraint reinforces our conclusion that Dr. Brooks' testimony, viewed in the light most favorable to the Varners, was not sufficient to show negligence, *i.e.*, an identifiable standard of care or its breach, or to warrant denial of the University's motion for summary judgment.[11]

B. *The claim of inadequate campus security procedures.*

(1) *The issues.*

■ The Varners' secondary claim of negligence on the part of the University relates to the security procedures put in effect following the murder of Eric Plunkett in September 2000. In support of this claim, the Varners presented the deposition testimony of two experts on security, Ira Somerson and Norman Bates. The Varners contend

1. that Gallaudet should have altered the programming of students' key cards to permit students to enter only their own dormitories; and

2. that Gallaudet "violated the common practice among universities to provide information potentially relevant to a crime investigation to police."

The evidence presented by the Varners in support of these contentions was insufficient to raise a genuine issue of material fact warranting the denial of summary judgment.

Mr. Somerson candidly acknowledged at his deposition that he was unaware of any national standard applicable to Gallaudet's security procedures:

Q: What was your understanding of the standards that are applicable to a college or university with regard to security it provides to students?

A: There is no such animal.

Q: There's no standard?

A: No.

Mr. Somerson went on to testify that "[i]t's a tinkering game. That's how you get at your standard of care." Thus, according to one of the Varners' security experts, no standard exists against which the University's security procedures could fairly be measured.

(2) *The programming of key cards.*

■ The Varners claim that Gallaudet violated a national standard of care by failing to program their key cards to prevent students from entering dormitories other than their own. When asked whether most universities restricted access in this way in 2001, the year in which Benjamin Varner was murdered, Mr. Bates responded that he did not know, because he had not done a survey on the subject. He indicated, however, that "five years prior to 2001 it was adopted by their own industry trade group as an accepted practice." The witness was apparently referring to a "recommended practice" of the International Association of Campus Law Enforcement Administrators (IACLEA) adopted in 1996 and published in IACLEA's *The Complete Campus Crime Prevention Manual.* The Manual itself makes it clear, however, that the IA-

---

years. We question whether, at least absent exceptional circumstances, the *length* of a suspension is a matter in which courts should presume to second-guess the University's disciplinary authorities.

11. The trial judge did not consider and, in light of our disposition of the appeals on other grounds, we likewise do not reach the ques-

tions whether it was foreseeable that Mesa's presence on the campus would place Benjamin Varner in physical danger and whether it was incumbent upon the plaintiffs to present evidence that violence on Mesa's part (as opposed to theft) was foreseeable in order to avoid summary judgment.

CLEA's recommendations were not standards but aspirational goals:

> Recognizing that academic environments vary widely—as do the safety and security risks they experience—*these recommended practices are not intended to serve as a formal security code or set of standards.* Rather, they are designed to represent *optimum* crime prevention practices for colleges and universities. Although crime prevention practices are recommended, institutions may elect to develop appropriate alternatives to these recommendations.

(Emphasis added.) [12]

█ Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence. *Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C.1995). To paraphrase what we stated in a different but somewhat analogous context in *Clark,* 708 A.2d at 636, "[t]o hold otherwise would create the perverse incentive for [universities and their administrators] to write [their manuals] in such a manner as to impose minimal duties upon [universities] in order to limit civil liability."

Moreover, even the aspirational policy favored by the IACLEA arguably has no application to this case. Mesa had lived in Cogswell Hall prior to Plunkett's murder, but together with some other students, he was moved to Krug Hall after that event. On the night that he murdered Benjamin Varner, some of his belongings were still at Cogswell Hall, and he was in the process of moving between Cogswell Hall and his new dormitory, Krug Hall. That evening, according to Mesa, he was admitted to Cogswell Hall by a Resident Assistant with whom he signed in, ostensibly so that he (Mesa) could rent a dolly in order to move his belongings. After Mesa was permitted entry into the dormitory, Benjamin Varner voluntarily admitted Mesa to Benjamin's room, which had a bolt lock. Mr. Bates candidly acknowledged that he had no opinion regarding whether the applicable standard of care was violated under these circumstances.

(3) *Failure to provide information to the police.*

█ The Varners' argument in their brief on appeal to the effect that the University negligently failed to provide relevant information to the police reads, in its entirety, as follows:

> In addition to addressing access control, Bates testified that Gallaudet violated the common practice among universities to provide information potentially relevant to a crime investigation to police, as part of their general duty to protect their students, a standard Gallaudet breached by not providing police with any of its information on Mesa's five-year crime spree. The affidavit filed by Gallaudet's expert on this point did not dispute the existence of this *standard;* in it, the expert merely disagreed with Bates over whether the standard was breached on the facts of this case.

We disagree with this contention.

█ First, Mr. Bates was unable to identify any specific standard of care requiring Gallaudet to collect, without a request or subpoena from police or prosecutors, incident reports relating to nonviolent crimes involving a student who

---

12. In his affidavit, Mr. Bates stated that "[i]n my opinion, the standards set forth in IACLEA do establish a national standard of care and guidelines for campus security and it was in effect at the time that Mr. Varner was murdered." Mr. Bates' "opinion" appears to be directly contrary to the italicized language in the Manual, and as we have indicated in the text, Mr. Bates had no information about the actual practices of universities in 2001.

had not been identified as a potential suspect. Rather, Mr. Bates relied solely upon "the general duty that a university would have to protect its students from harm from others." He went on to concede that he knew of no standard specifically requiring a college or university to provide such information to the police during a homicide investigation. An expert may not rely upon a general duty of care to establish an objective standard requiring specific conduct. *See Carmichael*, 577 A.2d at 315 ("when normative standards are used by an expert as a basis for assessing negligence, at the very least the expert must be specific as to what standards were violated and how they were violated"). Mr. Bates was unable to point to any specific standard of care with which the University failed to comply, nor could he identify a single college or university that did what he claimed Gallaudet should have done. On this record, we find unpersuasive the Varners' claim that the University was negligent by failing to volunteer information about Mesa to the police.

Moreover, within a day of the Plunkett murder, Gallaudet security personnel specifically identified Mesa to the police as a student who had engaged in suspicious behavior, and they suggested that the officers talk to Mesa. The police interviewed Mesa on at least two separate occasions and reported to Gallaudet that Mesa had been "cleared." It is undisputed that the police believed—and informed Gallaudet representatives that they believed—that Minch was responsible for Plunkett's murder. Further, the investigating officers never informed Gallaudet, prior to Benjamin Varner's murder, that the Plunkett homicide a few months earlier had in-

volved theft. Under these circumstances, Mesa's history of theft had no apparent relevance to the investigation of Plunkett's death. Moreover, the police never requested, and the prosecutors or grand jury never issued subpoenas for, any documents relating to disciplinary action against Mesa or any other student. As a result, Gallaudet was not apprised that Mesa's disciplinary records—or, more broadly, information relating to past thefts on campus— would be of any use to the police in determining the identity of Plunkett's killer.[13]

There is no suggestion in this record that the University impeded the investigation of the murder of Eric Plunkett in any way, or declined to provide any assistance requested by the police. Both police witnesses testified at their depositions that Gallaudet cooperated fully in the investigation of the Plunkett homicide, and that University representatives provided all of the documents and evidence that the police requested. In sum, the Varners have not identified any standard requiring the University to do anything that it did not do in order to assist the police in identifying Plunkett's murderer.

### C. *Conclusion.*

For the foregoing reasons, we agree with the trial court that the University was entitled to summary judgment as a matter of law.

## IV.

## THE JUDGMENT FOR THE DISTRICT OF COLUMBIA

The Varners claim that the District of Columbia, and specifically Detective Kyle Cimiotti, were negligent in their investiga-

---

13. It also appears that, at least in the absence of a subpoena, the University was precluded by the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232(g), from releasing Mesa's disciplinary records.

tion of the Plunkett murder. They contend that if the police had exercised reasonable care in investigating that murder, Mesa would have been swiftly apprehended, and he would therefore have had no opportunity to kill Benjamin Varner. Retired Detective Jeffery Greene, formerly of the homicide squad of the MPD, stated in an affidavit which was filed by the Varners in opposition to the District's motion for summary judgment:

> It is ... my opinion that had reasonable and professional techniques been employed in the Plunkett homicide investigation, that the MPD homicide detectives would have learned that Mr. Plunkett's credit cards and ATM cards were missing, that Mr. Mesa had used Mr. Plunkett's credit cards and ATM cards after Mr. Plunkett's death, and that had said practice been employed, that within a reasonable degree of certainty the MPD homicide detectives would have learned that Joseph Mesa, Jr. had used Mr. Plunkett's computer and Internet account and credit card to order bikes and have it [sic] delivered to his mailing address and also made other purchases.

Detective Greene further stated that, in his opinion, "the way that Defendant District of Columbia employees handled the Plunkett murder was grossly below the required, necessary, and acceptable standard of care and showed disregard for the safety of the students at Gallaudet ...." It was Greene's opinion that "had the homicide investigation followed standard procedures, [then] within a reasonable degree of investigative certainty, the murder of Benjamin Varner would not have taken place."

The District filed a motion for summary judgment, relying in part on the public duty doctrine. The District argued that

> plaintiffs are seeking to hold the government liable for the criminal conduct [of]

Mr. Mesa. However, under the well established common law of the District of Columbia, if the District owed no duty of care to the decedent beyond the general duty owed to the public at large, judgment must be entered for the District defendants.

Under the public duty doctrine,

> [the District of Columbia] and its agents owe no duty to provide public services to particular citizens as individuals. Instead, absent some "special relationship" between the government and the individual, the District's duty is to provide public services to the public at large.

*Powell v. District of Columbia,* 602 A.2d 1123, 1125 (D.C.1992) (citations omitted). The public duty doctrine shields the municipality and its agencies from suits attacking the manner in which the District of Columbia deploys its manpower and undertakes to discharge its obligation to the general public. *Hines v. District of Columbia,* 580 A.2d 133 (D.C. 1990); *see also Platt v. District of Columbia,* 467 A.2d 149 (D.C.1983).

It is well-settled in the District of Columbia that "a government and its agents are under no general duty to provide public services ... to any particular citizen." *Warren v. District of Columbia,* 444 A.2d 1, 4 (D.C.1981) (*en banc*); *see also Johnson v. District of Columbia,* 580 A.2d 140 (D.C.1990); *Hines, supra; Wanzer v. District of Columbia,* 580 A.2d 127 (D.C.1990). With respect to such public services, such as police protection, "the duty is to the public, and absent a special relationship, the District of Columbia cannot be held liable." *Platt, supra* (plaintiff's claims dismissed because the District of Columbia's frequent fire inspections and the issuance of certificate of occupancy did

not create a special relationship with the District and the theatre patrons).

Adopting language from our opinion in *Powell,* the District contended that "a duty owing to everybody can never become the foundation of an action until some individual is placed in [a] position which gives him particular occasion to insist upon its performance; it then becomes a duty to him personally." 602 A.2d at 1127 (quoting *Orzechowski v. State,* 485 A.2d 545, 549 n. 3 (R.I.1984)) (quoting 3 COOLEY, LAW OF TORTS § 478, at 366 (4th ed.1932)).

The trial judge granted the District's motion, essentially endorsing the District's position. The judge wrote that

> under the public duty doctrine, public officials such as police officers cannot be held liable for harm caused by criminals unless there was a "special relationship" between the victim and the official. *See, e.g., Platt v. District of Columbia,* 467 A.2d 149 (D.C.1983). In order to find that a "special relationship" had been created, a two-prong test applies: there must be either [sic] a direct or continuing contact between the victim and the police department, and there must be a justifiable reliance on that contact by the victim. *See id.*

> In the present case, neither prong of the test is met. Plaintiffs argue that a special relationship had been created by the prior murder of a Gallaudet student, and because the MPD had a presence on the Gallaudet campus. [Citation to record omitted.] Plaintiffs present no argument or evidence, however, to show that Benjamin Varner himself had any direct or continuing contact with the MPD. Merely because the police are present in an area does not create a special relationship with the people in that area. To the contrary, finding that a special relationship exists in such a situation would obviate the public duty doctrine, as a special relationship would be created between the police and the people in any area in which the police are doing their job. Thus, absent any information or argument by plaintiffs that a special relationship had been created between Detective Cimiotti and Benjamin Varner himself, as opposed to the entire Gallaudet student body, the public duty doctrine applies to this case.

We substantially agree with the District's argument and with the trial judge's analysis.

■■■ On appeal, the Varners contend, as they did in the trial court, that the police had created a "special relationship" with Benjamin Varner and with other students at Gallaudet, that Benjamin had relied on this special relationship and on promises of protection, and that the public duty doctrine therefore had no application. The Varners cite, *inter alia,* the affidavit of Benjamin's friend and fellow student, Casey Przygoda. In that affidavit, Ms. Przygoda stated in pertinent part:

> After Eric Plunkett was killed, I, *and other students at Gallaudet University,* were assured by the District of Columbia Police ("DC Police") that they were going to give us special protection in addition to what the rest of the community was given because *as students we were all frightened* and upset with what had happened.

> \*      \*      \*      \*      \*      \*

> I remember a meeting where the DC Police told us that they were there specifically to protect us and provide for our safety so that there would not be another murder. The DC Police also assured us they were working even harder to solve this murder because it has happened right on campus.

> I, *and other students at Gallaudet University,* relied upon the police to

provide us the necessary protection from the person who had committed the murders.

(Emphasis added.) In addition, plaintiffs Willie and Diane Varner, Benjamin Varner's parents, filed a joint affidavit in which they stated, in effect, that according to Benjamin, he personally was relying on assurances from the police that he and other students would be protected.[14]

In our view, these affidavits, and the arguments which the Varners have made on the basis of their factual representations, are insufficient to take the case out of the reach of the public duty doctrine. As the italicized language in Ms. Przygoda's affidavit itself reveals, any assurances of protection made by the police were directed to the Gallaudet students collectively, not to Benjamin Varner or to any other student individually. Gallaudet has approximately 2000 undergraduates and graduate students, as well as many faculty members and administrators. The presence of police officers on the campus, and their promises of protection, cannot reasonably be viewed as having created more than 2000 "special relationships." If, at Gallaudet, all 2000 students were entitled to avail themselves of the "special relationship" exception to the public duty doctrine, then that exception would emasculate and nullify the doctrine itself. Indeed, although the police owe a duty to the public,

any crime will primarily involve a segment of the public, often residents of a particular neighborhood, or, as in this case, students and faculty members at a particular institution. If, in such cases, all of the residents, students, or others who receive reassurance from the police, have a right of action against the District for any alleged negligence in solving one crime or in preventing a second, then the public duty doctrine effectively becomes a nullity.[15]

■　A *caveat* may be in order. "There is perhaps no doctrine more firmly established than the principle that liability follows tortious wrongdoing; that where negligence is the proximate cause of injury, the rule is liability and immunity is the exception." *Miller*, 841 A.2d at 1249 (concurring opinion) (quoting *Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107, 112 (1963)). The "public duty" line of cases represents a major exception to this generally salutary principle. In this case, if Detective Greene, formerly of the MPD's homicide squad, is correct in his assessment of the quality of the police investigation of the Plunkett homicide, then negligence on the part of the police proximately resulted in the untimely death of the plaintiffs' son at the hands of a murderer who should have been apprehended long before he could harm Benjamin Varner.[16] Nevertheless, the public

---

**14.** Given our disposition, we need not decide whether the Varners' joint affidavit was based on inadmissible hearsay, in violation of Super. Ct. Civ. R. 56(e).

**15.** We recently reiterated, in the context of a rescue operation, that even the plaintiff's reliance on negligent misrepresentation of fact by police officers does not render the public duty doctrine inapplicable. *Miller v. District of Columbia*, 841 A.2d 1244, 1248 (D.C.2004). Indeed, this court has rejected the "special relationship" exception to the doctrine in a number of cases in which the proffered basis for finding a "special relationship" was far

more plausible than the Varners' claim is in this case. *See, e.g., Miller*, 841 A.2d at 1246–48; *Warren*, 444 A.2d at 3; *Allison Gas Turbine v. District of Columbia*, 642 A.2d 841, 845 (D.C.1994).

**16.** To avoid any misunderstanding, we take no position as to whether the District was in fact negligent, as Detective Greene alleged. There has been no trial of the issue, and neither the Superior Court nor this court has had the opportunity to hear the District's side of the argument.

duty doctrine is well-established in this jurisdiction, and we entertain no doubt that it bars the Varners' suit against the District. Accordingly, we conclude that the trial judge properly granted the District's motion for summary judgment.

## V.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court in both appeals is *Affirmed.*